# 22-287-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

LLOYD KIDD, AKA Sealed Defendant 1,
AKA CHRIS KIDD, AKA GERARD AGARD, AKA RED,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

MIEDEL & MYSLIWIEC LLP
*Attorneys for Defendant-Appellant*
80 Broad Street, Suite 1900
New York, New York 10004
212-616-3042

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT PURSUANT TO FED. R. APP. P. 28(a)(4) ...................................1

STATEMENT OF ISSUES PURSUANT TO FED. R. APP. P. 28(a)(5) .............2

STATEMENT OF THE CASE ...................................................................3

STATEMENT OF FACTS .......................................................................4

    Arrest and Pretrial Motions ...........................................................4

    Trial ...........................................................................................7

    Rule 29 Motion ..........................................................................15

    Rule 33 Motion ..........................................................................16

    Sentencing .................................................................................17

SUMMARY OF ARGUMENT ...............................................................18

ARGUMENT ......................................................................................23

  I.  The Evidence Was Legally Insufficient to Establish Proper Venue
     in the Southern District of New York ...........................................23

       A.  There Was No Venue in the Southern District for Count 5 .........25

       B.  There Was No Venue in the Southern District for Count 1 .........34

  II.  Electronic Devices Seized in Appellant's Apartment at the Time of Arrest
      Should Have Been Suppressed ...................................................38

  III.The Court Erroneously Admitted Summary Charts/Reconstructions
      of Alleged Backpage.com Data Over Defense Objection ...........................45

       A.  Legal Standard ............................................................45

       B.  Application ..................................................................46

  IV.The Trial Court's Denial of Lloyd Kidd's Rule 33 Motion
      Was an Abuse of Discretion ......................................................53

       A.  The Rule 33 Motion ......................................................54

       B.  The Trial Court Should Have Found Excusable Neglect .............57

C. The Trial Court Should Have Concluded that Lloyd Kidd Received Ineffective Assistance of Counsel, or Should Have Held a Hearing ................................................................................. 61

V. Lloyd Kidd Received Ineffective Assistance of Counsel ............................ 67

A. Count 1 ................................................................................................. 67

B. Count 5 ................................................................................................. 71

CONCLUSION ................................................................................................... 74

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS .. 75

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................... 16, 53, 55

*Horton v. California*, 496 U.S. 128 (1990)..............................................................38

*Kovacs v. United States*, 744 F.3d 44 (2d Cir. 2014) ...................................... 64, 65

*Pham v. United States,* 317 F.3d 178 (2d Cir. 2003)...............................................67

*Pioneer Inv. Servs. Co. v. Brunswzck Assoc. Ltd. P'ship*, 507 U.S. 380 (1993).....58

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................ 64, 65, 67

*Turner v. United States*, 137 S. Ct. 1885 (2017) ....................................................57

*United States v. Babichenko*, 543 F. Supp. 3d 946 (D. Idaho 2021) .....................45

*United States v. Babilonia*, 854 F.3d 163 (2d Cir. 2017) .................................. 38, 42

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) ...........24

*United States v. Brand*, 467 F.3d 179 (2d Cir. 2006) ..............................................32

*United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999) ..........................................24

*United States v. Byam*, 2013 WL 4459002 (E.D.N.Y. Aug. 15, 2013) ...................43

*United States v. Cabrales*, 524 U.S. 1 (1998)........................................................23

*United States v. Davis*, 689 F.3d 179 (2d Cir. 2012)..............................................35

*United States v. Dupigny*, No. 18-CR-528 (JMF) (S.D.N.Y.) ......................... 49, 50

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012)..............................................31

*United States v. Fechner*, 952 F.3d 954 (8th Cir. 2020)..........................................45

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001).........................................57

*United States v. Ging-Hwang Tsoa*, 2013 WL 6145664 (E.D. Va. Nov. 20, 2013)51

*United States v. Groysman*, 766 F.3d 147 (2d Cir. 2014) .......................................51

*United States v. Irvin*, 682 F.3d 1254 (10th Cir. 2012) ..........................................46

*United States v. Johnson*, 323 U.S. 273 (1944) ......................................................24

*United States v. Kidd*, 2021 WL 2935971 (S.D.N.Y. July 13, 2021).......................3

*United States v. Kidd*, 386 F. Supp. 3d 364 (S.D.N.Y. June 18, 2019).............. 5, 41

*United States v. Kidd*, No. 18-CR-872 (VM) (S.D.N.Y.)................... 4, 6, 15, 16, 47

*United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018)..................................38

*United States v. Parse*, 789 F.3d 83 (2d Cir. 2015)...............................................57

*United States v. Purcell*, 967 F.3d 159 (2d Cir. 2020) ............................... 32, 33, 34

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999).....................................23

*United States v. Sirois*, 87 F.3d 34 (2d Cir. 1996)........................................... 33, 37

*United States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015) ............................. 30, 31, 33

*United States v. Thompson*, 896 F.3d 155 (2018).................... 27, 28, 30, 31, 32, 33

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011) ...................................... 32, 33

*Waiters v. Lee*, 857 F.3d 466 (2d Cir. 2017) ........................................................65

*Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411 (2d Cir. 2004) .................... 58, 61

**Statutes**

18 U.S.C. § 1591(a) ....................................................................................... 1, 3, 6

18 U.S.C. § 1591(b)(1)...................................................................................... 6, 30

18 U.S.C. § 1591(b)(2).............................................................................. 1, 3, 6, 35

18 U.S.C. § 1591(c) ..............................................................................................70

18 U.S.C. § 1952(a)(3)(A) ...................................................................................35

18 U.S.C. § 2251(a) ................................................. 1, 3, 6, 25, 28, 30, 32, 33

18 U.S.C. § 2251(e) ...................................................................................... 1, 3, 6

18 U.S.C. § 2422(a) .............................................................................................32

18 U.S.C. § 3231 ....................................................................................................1

18 U.S.C. § 3500 ..................................................................................................60

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 2255 ..................................................................................................59

**Other Authorities**

Fed. R. Crim. P. 18..............................................................................................23

Fed. R. Crim. P. 29..................................................................................... 15, 53

Fed. R. Crim. P. 33........................... 2, 15, 16, 20, 22, 53, 57, 58, 59, 60, 61, 66, 71

Fed. R. Crim. P. 45..................................................................................... 17, 58, 61

Fed. R. Evid. 1006 ...................................................................... 6, 19, 20, 45, 51

U.S. Const. Art. III, § 2, cl. 3 .............................................................................23

## STATEMENT PURSUANT TO FED. R. APP. P. 28(a)(4)

This is an appeal from a final judgment of the United States District Court for the Southern District of New York (Victor Marrero, J.), entered January 31, 2022, convicting appellant Lloyd Kidd, after jury trial under indictment S2 18-CR-872 (VM), of one count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b)(2), and one count of inducement of a minor to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2251(a) and (e). Jurisdiction in the district court was pursuant to 18 U.S.C. § 3231. A Notice of Appeal was timely filed in the district court on February 10, 2022. Jurisdiction in this Court is conferred by 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PURSUANT TO FED. R. APP. P. 28(a)(5)

This appeal presents the following issues to be determined by this Court:

I.     Was there legally insufficient evidence to establish that venue was proper in the Southern District of New York for each count of conviction?

II.    Was it reversible error for the district court to deny appellant's motion to suppress electronic devices seized in his apartment?

III.   Was it reversible error for the district court to admit into evidence summary charts or reconstructions of alleged Backpage.com data over appellant's lack of foundation and hearsay objections?

IV.    Did the district court abuse its discretion in denying appellant's motion pursuant to Fed. R. Crim P. 33 to vacate his conviction and grant a new trial, or to hold an evidentiary hearing?

V.     Did appellant receive ineffective assistance of counsel due to trial counsel's pursuit of an unwinnable trial strategy despite the availability of a far more viable theory of defense?

It is respectfully submitted that each of the above questions should be answered in the affirmative.

## <u>STATEMENT OF THE CASE</u>

Appellant Lloyd Kidd was convicted, after jury trial, of one count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b)(2), and one count of inducement of a minor to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2251(a) and (e).  He was acquitted of three other counts. Subsequent to the jury verdict, the appointment of new counsel, and post-trial motion practice, District Court Judge Victor Marrero sentenced appellant to the custody of the Bureau of Prisons for two concurrent terms of 256 months, to be followed by two concurrent 5-year terms of supervised release.  The Court did not order a fine or restitution but directed appellant to pay a $200 special assessment. A timely notice of appeal was filed on February 10, 2022.  Appellant is currently serving his sentence pursuant to the judgment.

Appellant appeals from the judgment of conviction entered on January 31, 2022, which includes written decisions issued by the district court in *United States v. Kidd*, 386 F. Supp. 3d 364 (S.D.N.Y. June 18, 2019), and *United States v. Kidd*, No. 18-CR-872 (VM), 2021 WL 2935971 (S.D.N.Y. July 13, 2021).

## STATEMENT OF FACTS

Arrest and Pretrial Motions

In early December 2018, Lloyd Kidd was charged by indictment in the Southern District of New York with sex trafficking two minors, Victim 1 and Victim 2. No. 18-CR-872 (VM), ECF No. 1 (S.D.N.Y.). Based on the indictment, the government obtained an arrest warrant and Mr. Kidd was arrested at his apartment in Brooklyn on December 12, 2018. Agents did not have a search warrant. During a "protective sweep" of Mr. Kidd's apartment following his arrest, law enforcement officers observed a number of electronic devices, including computers, storage drives, and cell phones. The devices were seized and were ultimately searched months later after the government obtained a search warrant. These searches revealed sizeable numbers of photographs and videos of naked or semi-naked women, and advertisements of women for prostitution services. Investigators also discovered three photographs and one video that were later deemed to constitute child pornography.[1]

As part of its investigation, the government searched servers allegedly maintained by Backpage.com and seized by the FBI when it shut down the site in 2018. From those servers, law enforcement allegedly obtained data and images of

---

[1] The images were of a female body that could have been an adult or a mature teenager. Victim 1 (Kaira Brown) later identified the person in the photos as herself and testified that they were taken before her 18th birthday.

advertisements for prostitution that had allegedly been posted by Mr. Kidd, who, according to the government, was prostituting a number of women for profit.

Prior to trial, the defense filed motions to suppress evidence seized at Mr. Kidd's apartment during his arrest. A21; A96.[2]  Among other arguments, the defense moved to suppress computers, storage drives, and other devices because they were not of "an immediately apparent incriminating character," and were therefore not properly seized.  A109–A110.  The defense pointed out that even if the government had reason to believe that Mr. Kidd had used cell phones in his prostitution business, there was no probable cause to believe that laptops or hard drives contained evidence of a crime.  A167–A168.

The District Court denied Mr. Kidd's motion.  Citing to a location warrant application filed a week before Mr. Kidd's arrest, the Court concluded that "the investigation here provided probable cause that the Seized Electronic Devices contained or constituted evidence of the crime."  SPA14 (*United States v. Kidd*, 386 F. Supp. 3d 364, 372 (S.D.N.Y. June 18, 2019)).  Specifically, "the December 4 Location Data Warrant already specified that Kidd (1) listed a cellphone number on online advertisements; (2) spoke with a minor victim who called that number;

---

[2] References the Appendix and Special Appendix will be cited as "A" and "SPA," respectively, followed by page numbers.

(3) took photographs of the minor victims; and (4) posted those photographs online." *Id.* (internal citations omitted).

Approximately two weeks before the scheduled trial, the government filed a superseding indictment against Mr. Kidd, charging him with five total counts. *See* A206–A214. Count 1 charged Mr. Kidd with sex trafficking Victim 1 (Kaira Brown) as a minor and by use of force, in violation of 18 U.S.C. § 1591(a), (b)(1) and (b)(2). Count 5 charged Mr. Kidd with the production of child pornography in violation of 18 U.S.C. § 2251(a) and (e), for allegedly having taken pornographic pictures of Victim 1 (Kaira Brown) before she turned 18. Counts 2–4 charged Mr. Kidd with sex trafficking other alleged victims.[3]

Lloyd Kidd proceeded to trial on July 8, 2019. In its motions *in limine* filed before trial, the government sought permission to admit, pursuant to Rule 1006 of the Federal Rules of Evidence, summary charts and reconstructions of data downloaded from servers the FBI seized from Backpage.com when it shut down the site in 2018. No. 18-CR-872 (VM), ECF No. 35 at 23–26 (S.D.N.Y.). Specifically, the government intended to call a forensic examiner from the FBI who analyzed the voluminous data taken from the servers and extracted information to "reconstruct" advertisements to look as they might have when

---

[3] Lloyd Kidd was acquitted of Counts 2-4. Accordingly, the statement of facts and argument will focus only on facts and law relevant to Counts 1 and 5, which involved the same alleged victim, Kaira Brown.

posted on Backpage.com. The defense objected on the ground that the "reconstructions" did not accurately reflect the way the posted advertisements looked on Backpage.com. No. 18-CR-872 (VM), ECF No. 47 at 7 (S.D.N.Y.).

During the first day of the trial, as the parties and the court continued to discuss the question of whether these reconstructions should be admitted, it became clear that the government did not intend to produce a witness who had personal knowledge about the FBI seizure of the Backpage.com servers, or who could verify that the data had, in fact, come from Backpage.com servers. This prompted the defense to expand its objection to admission of these reconstructions on the basis of lack of foundation and hearsay. A385–A387. The court overruled this objection. A388.

Trial

Kaira Brown, identified in the superseding indictment as Victim 1, testified as the government's first witness. A432. She testified that in the spring of 2015, when she was barely 16 years old, she was working as a prostitute. She testified that another person had posted a prostitution advertisement of her on Backpage.com and Mr. Kidd texted her at the phone number on the ad and offered her space to work out of his apartment in Brooklyn for a 50/50 split of the proceeds. A437–A438. Ms. Brown testified that this initial text from Mr. Kidd stated that she needed to be 18 years or older in order to accept his offer. A495.

7

She subsequently had a phone conversation with Mr. Kidd to discuss the details of the arrangement, during which she told him that she was coming from Manhattan. They agreed to meet at a subway stop in Brooklyn.  A438.

Ms. Brown testified that starting after that initial meeting in the spring of 2015, she worked off and on as a prostitute out of Mr. Kidd's apartment on Nostrand Avenue in Brooklyn for the next two years and split her profits with him. A466; A479.  She commuted to Mr. Kidd's apartment from Manhattan, although she would sometimes stay with him for days or even a couple of weeks.  A441–A442.  During that time, she also worked as a prostitute for other pimps.  A506.

Ms. Brown was asked to examine a series of photographs admitted into evidence as Exhibits 1212-1222.  A454–A455.  These photos were images of a young woman in a series of semi-nude and suggestive poses.  Ms. Brown identified herself in each of the photos contained in Exhibits 1212-1225.  A454–A455; A457. Trial Exhibits 1221-1222 depicted a woman in a red dress, sitting and reclining on a bed or sofa.  A1283; A1285.  Ms. Brown identified these photographs as ones that Mr. Kidd took of her and posted on Backpage.com on the very first day she met him, allegedly in the Spring of 2015.  A498.  She identified Exhibit 1225 as the photograph taken of her by someone else, posted on Backpage.com, to which Mr. Kidd had initially responded.  A499; A1291.  She testified that she gave that photo of herself to him to post as well.  *Id*.

8

Trial Exbibit 1213, one of the photos self-identified by Kaira Brown, shows a topless woman looking directly at the camera. The name "Nikki" and a phone number appear at the top of the photograph. A1280. The woman in Trial Exhibit 1213 clearly has a large tattoo on the front of her right thigh. *Id.* Exhibit 1217, also self-identified by Kaira Brown, similarly depicts a woman facing the camera who has a large tattoo on her right thigh. *See* A1282.

Ms. Brown was additionally shown Exhibits 1204-1207, three photos and short video clip. Exhibit 1204, which is blurry and pixelated, shows a nude woman lying back on a bed, with her legs in the foreground and her head in the background. Her face cannot be made out. The woman in Exhibit 1204 very clearly has no tattoo on her thigh. A1276. Exhibits 1205 and 1206 depict close-ups of a woman's genitalia, while Exhibit 1207 is a short video showing a close-up of a hand touching a woman's vagina. At the trial, Ms. Brown identified herself in each of these Exhibits. She testified that she knew that the person in Exhibit 1204 was her because of a tattoo on her left arm, as well as skin marks on her belly. A460–A461. The tattoo identified by Ms. Brown in Exhibit 1204 appears to be a line, or series of markings on the inside of her arm extending in a line diagonally from the crook of her arm toward her wrist. As the rest of the picture, it is pixelated

and blurry.[4]  A1276.  Ms. Brown also identified the person in Exhibits 1205-1207 as herself because of skin discoloration on her thighs.  *See* A463.

The government next called FBI forensic examiner, Erik Uitto, the witness who created summary charts and reconstructions based on data allegedly derived from Backpage.com servers.  As it had before his testimony, the defense continued to object based on lack of foundation and hearsay grounds, arguing that Mr. Uitto's entire personal knowledge came from the data that he downloaded from two servers and that he was *told* were Backpage.com servers seized by the FBI.  *See e.g.*, A521, A533, A543, A552.  The court overruled these objections.  A533–A534.  The witness testified that he had seen some samples of actual Backpage.com advertisements sent to him as part of local law enforcement inquiries, A529, and he testified that he saw and analyzed the data extracted from the two servers.  However, he did not, and could not, testify that he personally knew that the two servers had not been altered or modified, and were, in fact, the servers seized by the FBI from Backpage.

Through Mr. Uitto, the government introduced Exhibits 400-422, which were the reconstructed Backpage.com advertisements extracted from the alleged Backpage.com servers, and which additionally contained data, such as creation and

---

[4] At the trial, Ms. Brown lifted her arm to show the tattoo to the jury.  Neither party verbally described the tattoo for the record, nor introduced a photograph of the arm tattoo.  *See* A460–A461.

posting dates, that had not appeared on the original ads. A542–A544.[5] The government also introduced Exhibit 450, which contained, in spread sheet form, all the underlying data on which Mr. Uitto relied to build the summary charts and reconstructions. A535.

Exhibit 400 was a reconstructed advertisement showing photographs allegedly of Kaira Brown. A1266. The photographs on Exhibit 400 were the same as those depicted in Exhibits 1221-1225, identified by Kaira Brown as pictures Mr. Kidd took of her and posted on the first day he met her (Exhibits 1221-1222), and pictures someone else had taken that she gave to him to post (Exhibits 1223-1225). According to the data derived from Backpage.com and included on Exhibit 400, these photos were created on February 2, 2017 and posted on February 13, 2017. A1266. This contradicted Ms. Brown's testimony that Mr. Kidd had taken these photographs and posted them in the spring of 2015. A498-499.

The next relevant witness was FBI forensic examiner Porsche Brown. She testified that she had personally examined the electronic devices seized at Mr. Kidd's apartment on the day of his arrest. A684. She testified that the photos depicted in Exhibits 1204-1206 and the video in Exhibit 1207 were found on five different devices seized in Mr. Kidd's apartment, which she identified as follows:

- 1B3 – 2TB WD Elements external hard drive "CK Time Machine"

---

[5] As relevant to this appeal, Exhibits 400-402, 404, 407-411, and 415 are included in the Appendix at A1266-1275.

- 1B4 – Apple iMac
- 1B5 – Apple iMac
- 1B9 – 4TB Seagate external hard drive
- 1B14 – 4TB WD Elements external hard drive

A684–A691; A695–A696.[6]  Examiner Brown further testified that the

photographic images recovered from Mr. Kidd's electronic devices contained

metadata embedded in the images that provided certain information, such as the

date when the photos were taken.  A692.  Exhibits 1204M-1206M, 1230M-1232M,

1235M-1237M and 1345M-1347M established that the images in Exhibits 1204-

1206 had been created on February 1, 2017.  *Id.*  Exhibits 1233M, 1234M, 1242M

and 1348M established that the video clip in Exhibit 1207 was created on February

2, 2017.  A696.

Examiner Brown also testified that the images in Exhibits 1212-1226,

identified by Kaira Brown as images of her, were recovered from devices seized in

Mr. Kidd's apartment.  A698.  Examiner Brown did not provide a metadata report

for the photographs in Exhibits 1212-1226.  However, copies of these digital

images produced to the defense retain metadata, which can be viewed by right-

clicking the image and selecting properties/details.  The metadata associated with

Exhibits 1221-1222, the photographs that Kaira Brown testified were taken the

---

[6] FBI Special Agent Burk, who recovered these items at Mr. Kidd's residence, assigned evidence numbers to the electronic devices, which were reflected in her evidence log, introduced as Exhibit 100.  A579.

very first day she met Mr. Kidd, establishes that the images were created on February 1, 2017.[7]

Lloyd Kidd testified in his own defense. As relevant to this appeal, Mr. Kidd testified that he first met Kaira Brown in April 2017, when she was 18 years old. A951–A952. He also testified that in the Spring of 2015, he was living on Stanley Avenue in Brooklyn, not Nostrand Avenue, contrary to what Kaira Brown had testified. A497. He did not move to Nostrand Avenue until April 2016. A960. Defense counsel introduced a piece of mail from Chase Bank, addressed to Mr. Kidd at the Stanley Avenue address, dated December 2015. A962. As for the Backpage.com reconstruction exhibits, 400-422, Mr. Kidd asserted that the creation dates incorporated into those exhibits were incorrect. For Exhibit 400, which showed pictures of Kaira Brown, Mr. Kidd stated that the creation date had to be April 2017, not February, because he did not meet Ms. Brown until April. A987–A989.

Mr. Kidd testified about his relationship with Kaira Brown. He admitted that he posted advertisements for prostitution for her, that he provided her with a place to work out of, that she stayed at his apartment at times, and that they shared the profits of her prostitution work. A966–A967; A1033–A1034. He adamantly

---

[7] *See* A1284; A1286. For demonstrative purposes, the metadata retrieved from Exhibits 1221–1225 is produced here at A1283–A1292.

denied that she worked with him when she was a minor and that he used any kinds of threats, coercion, force, or violence against her.  A952–A954.

On cross-examination, Mr. Kidd was shown trial Exhibits 1204 and 1207. Because these images allegedly constituted child pornography, he had only seen them for the first time briefly during the trial.  A1368–A1369.  When he was shown Exhibit 1204 and was asked whether he took that photograph of Kaira Brown, he first answered, "more than likely," but when pushed, answered "yes," although insisting that the metadata was wrong.  A1038.  When shown the video in Exhibit 1207, Mr. Kidd testified that he did not know if he took that video.  *Id*.

In summation, Mr. Kidd's counsel attacked the evidence supporting Counts 1 and 5 by attempting to establish that the time stamps on the photos allegedly taken of Kaira Brown before her 18th birthday were incorrect and could not be relied on.  A1142–A1146.  He tried to demonstrate that, for example, Kaira Brown was not in Brooklyn on February 2, 2017, when the metadata showed the video in Exhibit 1207 was created, suggesting that the metadata establishing those dates was therefore inaccurate.  *See* A1144–A1146.  He did not argue, however, that the photos forming the basis of the child pornography count did not, in fact, depict Kaira Brown.

At the conclusion of the trial, the jury acquitted Mr. Kidd of three counts – Counts 2, 3, and 4 – and acquitted him of the force element in Count 1, sex

14

trafficking Kaira Brown. The jury found Mr. Kidd guilty of sex trafficking Kaira Brown as a minor in Count 1, and of producing pornographic images of Ms. Brown as a minor, Count 5. A1257–A1262.

Following the verdict, trial counsel requested additional time to file Rule 29 and Rule 33 motions, and the court scheduled a hearing for about a month later. A1264.

Rule 29 Motion

About two weeks after the verdict, Mr. Kidd requested new counsel, and the district court relieved trial counsel and appointed new counsel from the Criminal Justice Act panel. No. 18-CR-872 (VM), ECF No. 84 (S.D.N.Y.). To permit counsel to familiarize himself with the record, the court agreed to postpone the Rule 29 hearing until October 11, 2019.

On that day, counsel offered oral argument in support of a motion under Rule 29 that the evidence at trial had been legally insufficient to establish venue for both Counts 1 and 5. A1299–A1307. Counsel argued that all of the criminal conduct in the case – the prostitution, posting of advertisements, taking of photographs – had taken place in Brooklyn, and that Kaira Brown's travel from Manhattan to Brooklyn to work out of Mr. Kidd's apartment was insufficient to establish venue in the Southern District. The court denied the motion in an oral ruling at the conclusion of the hearing. A1318.

15

Rule 33 Motion

On November 7, 2019, the court adjourned sentencing without a date to allow the Department of Probation to complete its presentence report.  No. 18-CR-872 (VM), ECF No. 99 (S.D.N.Y.).  In March 2020, the Covid-19 pandemic shut down the courts and delayed Mr. Kidd's sentencing.

On May 19, 2021, the defense filed an extensive motion to vacate Mr. Kidd's conviction under Rule 33 of the Federal Rules of Criminal Procedure, arguing that the government's failure to abide by its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and the ineffectiveness of Mr. Kidd's trial counsel, led to the probability that a manifest injustice had occurred in Mr. Kidd's convictions of Count 5 and, to a lesser degree, Count 1.  *See* A1320–A1375.  The argument was based on the fact that self-identified photographs of Kaira Brown in Exhibits 1213 and 1217 showed her with a large tattoo on her right thigh, while the alleged child pornography image in Exhibit 1204, also identified by Ms. Brown as depicting her, did not have such a tattoo.  The photographs were taken 2 ½ months apart, but there was no evidence or suggestion that Kaira Brown obtained a tattoo in the intervening period.  If she did not, the defense argued, the person in Exhibit 1204 was not her, and trial counsel was ineffective for having missed this discrepancy.  A1346–A1349.

The motion requested a new trial, or, in the alternative, an evidentiary

16

hearing at which the issues raised in the motion could be adjudicated. The defense conceded that the motion was untimely but urged the trial court to find "excusable neglect" under Fed. R. Crim. P. 45(b)(1)(B), given the particular circumstances of the situation, and the lack of actual prejudice to the government. On July 13, 2021, after the government's response and a defense reply submission, *see* A1376–A1399; A1400–A1408, the trial court denied the motion, finding it to be untimely and, alternatively, to fail on the merits. *See* SPA31–SPA32.

Sentencing

On January 28, 2022, the district court sentenced Mr. Kidd to 256 months' imprisonment on each of the two counts of conviction, to be served concurrently. *See* SPA37–SPA42. The court also imposed 5-year concurrent terms of supervised release. *Id.* Mr. Kidd, who has been incarcerated since his arrest on December 12, 2018, is presently serving his sentence. A timely notice of appeal was filed on February 10, 2022. *See* A1430.

## SUMMARY OF ARGUMENT

Lloyd Kidd raises five claims on this appeal.  First, he asserts that the government presented legally insufficient evidence at trial to establish venue in the Southern District of New York for both counts of conviction.  Mr. Kidd ran a prostitution business out of his apartment in Brooklyn.  All of the activities related to that business – the prostitution itself, the profit sharing, the production of online advertisements, the taking of photographs and videos – occurred in Brooklyn.  The government's theory for venue was that when Mr. Kidd first reached out to Kaira Brown in response to an advertisement someone had posted of her, she was in Manhattan.  Subsequently, in the allegedly two years she worked out of Mr. Kidd's Brooklyn apartment off and on, she traveled there from Manhattan.  The production of child pornography count, Count 5, was based on images produced in February 2017.  Mr. Kidd argues that the initial conversation he had with Kaira Brown, allegedly in the spring of 2015, was too attenuated to constitute enticement for the production of child pornography two years later.  Nor did her decision to commute to her work in Brooklyn from Manhattan establish enticement or some other element of the crime and was therefore insufficient for venue.

A similar argument applies to Count 1.  Merely traveling to the location where the criminal conduct took place was not one of the elements of the crime and therefore did not bestow venue.  Moreover, venue must be established for each

count separately.  Count 1 charged Mr. Kidd with sex trafficking a minor.  There was no evidence that when Mr. Kidd reached out to Ms. Brown while she was in Manhattan to invite her to work with him in Brooklyn, he knew or had reason to know that she was a minor.  In fact, he explicitly made clear that he was interested only in women 18 and older.

Second, appellant asserts that the district court erroneously denied his motion to suppress physical evidence seized from his apartment in connection with his arrest on December 12, 2018.  The government did not have a search warrant.  Following a protective sweep of Mr. Kidd's apartment, law enforcement seized a number of electronic devices that were located in plain view.  Appellant asserts that the devices were improperly seized, and should therefore be suppressed, because the electronic devices, which included computers and hard drives, were not of an "immediately apparent incriminating character," and because the government lacked probable cause to believe that these particular devices were used in the commission of the crime or contained evidence.

Third, appellant argues that the district court erroneously admitted summary charts or reconstructions of alleged Backpage.com advertisements into evidence pursuant to F.R.E. 1006 over the defense's lack of foundation and hearsay objections.  At trial, the government was permitted to introduce into evidence a series of exhibits created by an FBI forensic examiner that sought to reconstruct

roughly for the jury how Backpage.com ads may have appeared. The government did not call a witness from Backpage.com to discuss how data was kept and organized at Backpage.com. Nor did the government call a witness from the FBI who had personal knowledge about the circumstances under which the FBI seized Backpage.com's servers, and who could connect the data about which the forensic examiner testified to the servers actually seized. Without that personal knowledge, the forensic examiner who testified was in no position to authenticate and render the underlying data admissible. Since the data was inadmissible due to a lack of foundation and hearsay, the summary charts or reconstructions were also not admissible under F.R.E. 1006. Accordingly, the district court should have granted the defense request to exclude the summary charts or reconstructions.

Fourth, appellant asserts that the district court's denial of his motion pursuant to Rule 33 of the Fed. R. Crim. P. to vacate his conviction and grant a new trial was an abuse of discretion. The Rule 33 motion argued *inter alia* that the ineffectiveness of Mr. Kidd's trial counsel led to the probability that a manifest injustice had occurred in Mr. Kidd's convictions of Count 5 and, to a lesser degree, Count 1. Specifically, the motion argued that trial counsel had missed a crucial piece of evidence – namely that photos depicting Victim 1 (Kaira Brown) showed her with a large thigh tattoo, whereas the alleged child pornography images, allegedly taken less than three months earlier, and which did not show a face for

easy identification, had no such tattoo. The government presented no evidence to account for this discrepancy, and the defense failed to capitalize on it. Without an explanation from Kaira Brown, the jury could easily have been persuaded that the female in the alleged child pornography images was not Kaira Brown, which would have led to a certain acquittal on Count 5, and a probable acquittal on Count 1. The district court's denial of the motion as untimely was an abuse of discretion because the defense had established "excusable neglect." Moreover, the district court should at least have granted the request for an evidentiary hearing to flush out the facts surrounding the tattoo because the discrepancy raised a real possibility that Mr. Kidd was innocent of Count 5.

Lastly, appellant asserts that he received ineffective assistance of counsel at trial because counsel pursued an unwinnable trial strategy for Counts 1 and 5, while ignoring a theory of defense that, in all likelihood, would have resulted in acquittals on those counts. Counsel chose to attempt to argue that metadata imbedded in images introduced as evidence at trial, and which showed that Kaira Brown had worked as a prostitute for Lloyd Kidd when she was 17 years old, was incorrect. Counsel did so without calling an expert to testify about the unreliability of metadata. Instead, counsel should have argued that the metadata undermined Kaira Brown's testimony that she met Mr. Kidd when she was 16 years old, and that the data indicated that she did not start working with Mr. Kidd until she was

six weeks shy of her 18th birthday. This would have allowed the jury to conclude that Mr. Kidd did not know, and had no basis to know, that Kaira Brown was not yet 18. In light of the fact that the jury did not otherwise find Kaira Brown credible as evinced by its acquittal of her claim that Mr. Kidd used force or coercion against her, this defense theory may very well have been successful. Similarly, for Count 5, as argued in the Rule 33 motion, by conceding that the person in the alleged child pornography images was Kaira Brown, counsel guaranteed conviction. Instead, he should have seized on the absence of the large tattoo and argued that Kaira Brown was not credible in her self-identification of photos of a blurry faceless female body. Counsel's decision to pursue unwinnable strategies in lieu of alternatives that had a significant chance of success constituted ineffective assistance of counsel.

## **ARGUMENT**

### I.     **The Evidence Was Legally Insufficient to Establish Proper Venue in the Southern District of New York**

The Constitution requires that a criminal trial must be held in the state and district where the crimes were committed.  *See* U.S. Const. Art. III, § 2, cl. 3; U.S. Const. Amend. VI; *see also* Fed. R. Crim. P. 18 ("prosecution shall be had in a district in which the offense was committed").  As the Supreme Court has observed, "[p]roper venue in criminal proceedings was a matter of concern to the Nation's founders. … The Constitution twice safeguards the defendant's venue right: Article III, § 2, cl. 3, instructs that "Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed"; the Sixth Amendment calls for trial "by an impartial jury of the State and district wherein the crime shall have been committed."  *United States v. Cabrales*, 524 U.S. 1, 6 (1998).

The Supreme Court teaches that the "*locus delicti* of the charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it. In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts."  *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (internal citations and quotation marks omitted).  Venue is proper only where crimes' "essential conduct elements" took place.  *Id.* at 280.  It is "not proper in a district in which the only acts performed by

23

the defendant were preparatory to the offense and not part of the offense." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989). Furthermore, venue provisions must be narrowly construed. *See United States v. Brennan*, 183 F.3d 139, 146 (2d Cir. 1999) ("*Johnson* articulated a rule favoring restrictive construction of venue provisions") (citing *United States v. Johnson*, 323 U.S. 273 (1944)).

In this case, the facts concerning venue for Counts 1 and 5 are not in dispute. It is undisputed that the images and video (Trial Exhibits 1204-1207) that are the subject of Count 5 were produced in Brooklyn, which is in the Eastern District of New York. It is also undisputed that all acts of prostitution that form the basis for Count 1 took place in Brooklyn. Lastly, it is undisputed that Kaira Brown traveled from Manhattan to Brooklyn to work with Lloyd Kidd as a prostitute in Brooklyn. The dispute here arises out of the question of whether the alleged communications between Mr. Kidd and Kaira Brown, while she was in Manhattan, constituted part of the offense and therefore provided venue in the Southern District, and/or whether Mr. Kidd's knowledge that Ms. Brown commuted from Manhattan to work out of his apartment in Brooklyn was sufficient to bestow venue on the Southern District. For the reasons set forth below, the evidence was legally insufficient to permit the jury to conclude that venue existed in the Southern District for both Count 5 and Count 1.

A. Underline{There Was No Venue in the Southern District for Count 5}

The jury found Lloyd Kidd guilty of Count 5, which charged him with the production of child pornography in violation of 18 U.S.C. § 2251(a). In order to find him guilty, the jury was instructed that it had to conclude beyond a reasonable doubt that "Mr. Kidd used, employed, persuaded, induced, enticed or coerced Victim-1 (Kaira Brown) to take part in sexually explicit conduct for the purpose of producing or transmitting a visual depiction of that conduct." A1216. Because the government had to concede that the production of the images at issue for Count 5 took place in Brooklyn, its theory on venue was based on the argument that Mr. Kidd "induced" or "enticed" Kaira Brown to participate in the production while she was in Manhattan. In so doing, the government relied on two aspects of Kaira Brown's testimony.

First, Ms. Brown testified about a communication she had with Mr. Kidd in 2015. Specifically, she testified that another person had posted a prostitution advertisement of her on Backpage.com in the spring of 2015. According to Ms. Brown, Mr. Kidd texted her at the phone number on the ad and offered her space to work from in Brooklyn for a 50/50 split of the proceeds. A437–A438. She subsequently had a phone conversation with Mr. Kidd to discuss the details of the

arrangement, during which she told him that she was coming from Manhattan. They agreed to meet at a subway stop in Brooklyn.[8]  *Id.*

Second, the government also relied on Ms. Brown's testimony that between 2015 and 2017 she frequently traveled between the group home where she lived in Manhattan and Mr. Kidd's apartment, where she engaged in prostitution.  A441–A442, A462, A473, A500.  Sometimes Ms. Brown stayed with Mr. Kidd for several days, not only for work, but because she did not want to stay in the group home or with her mother, and "the defendant's house was another place that I could go to."  A473–A474.  Ms. Brown also specified that before traveling to Brooklyn, *she* would reach out to Mr. Kidd to find out if there was room in his apartment to work.

> A. If I was planning on coming to the defendant's apartment and I was at my group home, I would have to text him first to see if there was space for me there to work.
> Q. And would he respond prior to you leaving?
> A. Yes, he would say no, there was no space and I couldn't go, or he would say yeah, you can come, there's space for you to work.

---

[8] While for purposes of a legal insufficiency argument the credibility of Kaira Brown has to be assumed, it is worth noting that her story is not, in fact, credible.  For example, she testified that on the first day she worked for Lloyd Kidd in the spring of 2015, he took the pictures in Exhibits 1221 and 1222, and posted them on Backpage.com.  A498.  As the data from Backpage showed, however, those pictures were not created and posted until February 2017.  *See* A1266.  Nor did the government introduce a single piece of evidence that corroborated Kaira Brown's testimony that she met Lloyd Kidd before 2017.

A462.  This testimony, the government argued in its defense of venue for Count 5, was sufficient to prove "enticement" for the production of imagery in February 2017.  *See* A1308, A1311.  To the contrary, it was insufficient for venue because Mr. Kidd committed no part of the crime of Count 5, including alleged "enticement," in the Southern District.

The central case to have addressed this issue in this Circuit, and heavily relied upon by the government, is *United States v. Thompson*, 896 F.3d 155 (2018).  Thompson met a pair of minor victims who, for the next two years, worked for him as prostitutes, primarily in Brooklyn.  As the Court explained,

> Thompson employed a variety of methods to gain and maintain control over the girls. He shared an address in Brooklyn with them for at least some of the time during which he sold their prostitution services, and he exercised stringent control over the girls' finances. He professed affection for them and, at the same time, threatened them with violence and cursed at them. Thompson personally tattooed his alias—"LP"—under M2's eye, and M1 had his first name tattooed on her breast. The record contains numerous transcripts and recordings of conversations between Thompson and each of the teenagers that depict this controlling and manipulative relationship.

*Id.* at 159–60.  Even when incarcerated at Riker's Island for a few months, Thompson continued to exercise control over the two minors, and managed their prostitution activities.  *Id*. at 160.  This Court also noted that Thompson sent "lewd photographs of other minors to M1 while both he and M1 were in Brooklyn."  *Id.* at 173.

27

About two years into their relationship, Thompson was arrested in the Bronx. He had in his possession a video of himself engaging in a sex act with one of the two minors. There was no dispute that the video was produced in the Bronx. The video formed the basis of a count charging Thompson with the production of child pornography in violation of 18 U.S.C. § 2251. Thompson was charged in the Eastern District of New York.

In affirming Thompson's conviction, this Court concluded that there was sufficient evidence in the record to allow a jury to conclude that Thompson "enticed" or "induced" the victim in the Manhattan video while working with her in Brooklyn:

> [O]ver a lengthy period—from early 2013 until December 2014, when the video was made—Thompson enticed and groomed M1 in the Eastern District of New York, training this teenager to do his bidding. The grooming involved M1's prostitution in the Eastern District of New York at his behest, and Thompson's sending lewd photographs of other minors to M1 while both he and M1 were in Brooklyn. … Thompson's manipulation over the previous eighteen months rendered M1 (only fifteen years old at the time the video was produced) susceptible to the request (or demand) that was to come.

*Id*. at 173.

The facts in this case are fundamentally different from those in *Thompson*, and to stretch them to fit *Thompson*'s framework would reduce the constitutional venue requirement to a mere footnote. In *Thompson*, except for the production of the video, *all* of the defendant's criminal activity – sex trafficking, advertising,

28

sending lewd pictures of minors to the victim – took place in Brooklyn, where he was, in fact, prosecuted. If Lloyd Kidd's case were analogous to *Thompson*, all of the prostitution activities would have taken place in Manhattan, he would have posted to Backpage.com in Manhattan, and only the production of the images underlying Count 5 would have occurred in Brooklyn.

That, however, was not the case here. Here, there was no sexual activity in Manhattan. No prostitution. No advertisements. No living together that would have allowed enhanced manipulation and control. No photos. No videos. The only connection Manhattan had to Mr. Kidd's crime of conviction was that Kaira Brown commuted from there to engage in prostitution in Brooklyn. Over a period of two years, according to Ms. Brown, she voluntarily came to his apartment and voluntarily left his apartment.[9] When she wanted to come, she would text or call to make sure there was room for her. There is no evidence in the record that he was the one who cajoled her to come to Brooklyn to work. She also viewed his apartment as a place of refuge away from the group home. Nothing in her testimony suggested that Mr. Kidd had some kind of control over her or that he was trying to manipulate her or lure her back from Manhattan to come to Brooklyn

---

[9] *See e.g.*, A447 (Kaira Brown got upset with Mr. Kidd because he short-changed her, so "I packed my stuff and I left."); A479 ("I was yelling at him and then I ended up going to the store, going back to the house, and a little time after that I just packed my stuff and was like I'll be back, and I just left.").

to take pictures.[10]  Even when specifically asked by the prosecutor about the time

Mr. Kidd took photos of her, and her related travel from Manhattan, Ms. Brown

could only say that even on that particular occasion, it was she who contacted Mr.

Kidd to inquire about availability at the apartment.  A462.

That is not inducement. And even if the jury had concluded that Ms.

Brown's work with Mr. Kidd, his alleged manipulation, their financial arrangement

– made her "susceptible to the request (or demand) that was to come," *Thompson*,

896 F.3d at 173, unlike in *Thompson*, all of that activity still took place in

Brooklyn, not in the district of prosecution.  That is the fundamental difference and

the reason why *Thompson* does not help the government.

The facts in Mr. Kidd's case are similarly inapposite to those in *United

States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015), which this Court in *Thompson*

cited with approval.  In *Sullivan*, the defendant met a minor girl in the Northern

District of California.  He spent weeks with her there, living with her and having

sex with her.  He also took pictures of her in the Northern District.  At some point,

he traveled with her to the Eastern District of California and took a pornographic

video of her there – which formed the basis of a production count in violation of 18

U.S.C. § 2251(a).  *Id.* at 628.  The case was prosecuted in the Northern District of

---

[10] Notably, the jury rejected Kaira Brown's testimony about coercion, threats, and violence and acquitted Mr. Kidd of violating 18 U.S.C. § 1591(b)(1).

California and the defense argued that venue did not lie in that district because the video was produced in the Eastern District. The Ninth Circuit Court of Appeals affirmed, holding that Sullivan "established and maintained physical and mental control over the relationship between himself and the girl from the time she first entered his car in Berkeley, which is in the Northern District, and used this control to coerce her into making a sex video. … [T]the persuasion, inducement, enticement and coercion that led to the video's filming in Vacaville had their genesis in the Northern District." *Id.* at 631 (internal quotation marks omitted).

As in *Thompson*, significant criminal conduct took place in the charging district in *Sullivan* – namely sexual activities and the taking of explicit photos. Only the video production occurred in a neighboring district and came at the conclusion of weeks during which the minor was essentially a prisoner and sex slave of Sullivan's, who exercised complete control over her. Because he had maintained complete and continuous control over her, these facts easily led to the conclusion that Sullivan coerced and induced the victim into making the video while in the Northern District. But those facts are not analogous to the circumstances here. Here, no criminal conduct or manipulation and control took place in the Southern District of New York.[11]

---

[11] In that sense, this case is also different from the facts in *United States v. Engle*, 676 F.3d 405, 418 (4th Cir. 2012), another case cited by this Court in *Thompson*. In *Engle*, the Court found significant evidence of "grooming" behavior in the charging district: "[h]owever, viewing the

Since *Thompson*, this Court decided *United States v. Purcell*, 967 F.3d 159

(2d Cir. 2020). The defendant in *Purcell* operated a commercial sex business and

recruited women from around the United States to serve as prostitutes. One of the

issues in the case was whether venue was proper in the Southern District of New

York for Count 1, enticement to engage in unlawful sexual activity, in violation

of 18 U.S.C. § 2422(a). Among other arguments, the government asserted that

venue existed in the Southern District because Purcell drove through that district

from Brooklyn to meet a prospective prostitute in North Carolina. This Court

rejected that argument, holding that

> Purcell attempted to recruit Alcantara by *meeting* with her, not by
> *traveling to* his meeting with her. This Court has previously held that
> venue did not lie in a case in which the defendant merely boarded an
> airplane flight in the relevant jurisdiction, en route to a meeting at
> which he committed the offense. *See Tzolov*, 642 F.3d at 319. Here,
> similarly, any passage by Purcell through the Southern District of
> New York on his way to Charlotte was merely a "preparatory act[]"
> for the offense conduct and does not by itself establish a basis for
> venue.

---

evidence presented at trial in the light most favorable to the government, we believe that a jury
could reasonably find by a preponderance of the evidence that Engle's sexually themed
communications with A.M., and especially his sending naked pictures of himself to her, were
part of his effort to "groom" her for that purpose, which is sufficient to establish enticement
under § 2251(a)." Here, there was one communication two years before the production of
images, and "knowledge" that Ms. Brown commuted from Manhattan. All other activities took
place in Brooklyn. This could not constitute "grooming" as that term is understood in sex
trafficking cases. *See e.g. United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006) ("Overall,
during his chat sessions with "Sara" and "Julie," Brand's behavior—sharing pictures, flirting,
and attempting to gain affection—constituted classic "grooming" behavior in preparation for a
future sexual encounter.")

*Id.* at 190 (emphasis in original), *citing United States v. Tzolov*, 642 F.3d 314, 319 (2d Cir. 2011) ("In other words, going to Kennedy airport and boarding flights to meetings with investors were not a constitutive part of the substantive securities fraud offense with which Butler was charged."). *See also United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996) ("we hold that a jury may find a violation of § 2251(a) so long as the evidence shows that illegal sexual activity for the production of visual depictions of that activity was one of the dominant motives for the interstate transportation of the minors, and not merely an incident of the transportation.")

Unlike the defendants in *Thompson* and *Sullivan*, Mr. Kidd did not entice or induce Kaira Brown in Manhattan to come to Brooklyn to produce child pornography. He did not maintain control over her. As she testified, she often left his apartment – indeed, at times she left to work for other pimps. A506. To the extent that Mr. Kidd exercised any influence over her, in the sense that he had a sexual relationship with her, advertised her on Backpage.com, shared in her prostitution proceeds, provided a place for her to work and sleep – that conduct all took place in Brooklyn. There was simply no evidence presented for a jury reasonably to conclude that Mr. Kidd enticed Ms. Brown to come from Manhattan to Brooklyn so he could take pornographic pictures of her.

To the government, venue may seem like an irritating and technical hurdle. But it is a right not only ensconced in the federal rules of criminal procedure, it lives in the Constitution itself, and therefore should not be written out of the law because it is inconvenient. The Southern District's contact to the elements of Count 5 is so faint as to be nearly invisible. Accordingly, Mr. Kidd's conviction on Count 5 should be reversed and the charge should be dismissed.

B. There Was No Venue in the Southern District for Count 1

The evidence relied upon by the government in support of venue for Count 1 was the same as for Count 5 – primarily the fact that Mr. Kidd reached out to Kaira Brown in response to her advertisement and offered to provide a space for her to work out of. *See* A1308–A1309. As discussed above, all of the conduct related to sex trafficking took place in Brooklyn. Ms. Brown worked out of Mr. Kidd's apartment in Brooklyn, he advertised her online in Brooklyn, he took pictures of her in Brooklyn. As this Court stated in *Purcell*, "[v]enue is proper only where the acts constituting the offense – the crime's essential conduct elements – took place. It is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." 967 F.3d at 186 (internal citations and quotation marks omitted). The totality of the circumstances here makes clear that whatever inducement, solicitation, or enticement may have occurred in this case, occurred in Brooklyn. The initial communication between

34

Mr. Kidd and Ms. Brown was preparatory at most and was not part of the

offense.[12]

The evidence was legally insufficient as to venue for Court 1 for another

reason. "[T]he government must satisfy venue with respect to each count." *United*

*States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). As charged to the jury, the

relevant elements of Count 1, sex trafficking of a minor in violation of 18 U.S.C. §

1591(b)(2), were as follows:

> First, that Mr. Kidd knowingly recruited, enticed, harbored,
> transported, provided, obtained, advertised, maintained, patronized or
> solicited Victim-1 (Kaira Brown); Second, that Mr. Kidd knew or
> recklessly disregarded the fact that Victim-1 (Kaira Brown) was under
> the age of 18 and would be caused to engage in a commercial sex act.

A1199. Mr. Kidd committed the crime of sex trafficking a minor only once he

knew or recklessly disregarded the fact that Kaira Brown was under the age of 18

(or had a reasonable opportunity to observe her). Without that element, the

evidence may have been sufficient to establish the crime of promoting prostitution

(18 U.S.C. § 1952(a)(3)(A)), but it was insufficient for conviction under §

1591(b)(2). Mr. Kidd was not charged with promoting prostitution, running a

commercial sex business, or anything else related to those offenses. He was

---

[12] Moreover, as Ms. Brown admitted herself, she did not need to be enticed to work in
prostitution – she was already working as a prostitute when Mr. Kidd contacted her. *See* A494–
A495.

charged with sex trafficking a minor, and to establish venue, some part of *that crime* had to take place in the Southern District of New York.

Kaira Brown testified that when Mr. Kidd reached out to her via text message in response to her ad on Backpage.com, he made clear that he was looking to work with women 18 years or older:

> Q.   What did he say when he reached out to you?
> A.   It was like a mass text, kind of, like a paragraph. And it said basically there is a room in Flatbush and Nostrand close by train, close by food.  He had a room available to work from. And everything was 50-50 split.
> Q.   Didn't it say you had to be over 18?
> A.   Yeah.
> Q.   It did?  It said that right in that original text?
> A.   Yes, it said 18 plus.   So I am assuming, yes.

A495–A496.[13]  Based on this communication, there was no evidence in the record that Mr. Kidd knew, should have known, or recklessly disregarded the fact that Kaira Brown was a minor at the time he invited her to come to Brooklyn to work as a prostitute.  In fact, Ms. Brown testified that she did not reveal her true age to Mr. Kidd until "months" after she met him.  A442.

Whatever invitation may have occurred in that first communication, it was not an invitation to sex traffic a minor – the crime with which Mr. Kidd was charged in Count 1.  The subsequent travel that occurred between Manhattan and Brooklyn between 2015 and 2017, of which Mr. Kidd allegedly had knowledge,

---

[13] Nor did the advertisement itself mention her age.  A496.

did not constitute solicitation or enticement.  It was, as this Court stated in *Sirois*, "merely an incident of the transportation." 87 F.3d at 39.  Accordingly, venue also did not exist for Count 1 in the Southern District of New York, and the conviction of that count should be reversed and the charge should be dismissed.

**II.    Electronic Devices Seized in Appellant's Apartment at the Time of Arrest Should Have Been Suppressed**

The law concerning law enforcement's right to seize physical evidence in plain view without a search warrant is well established.  A warrantless seizure of private possessions is only lawful where two essential requirements are met: (1) the officer is lawfully in a position to view and access the object, and (2) the incriminatory character of the object is "immediately apparent."  *Horton v. California*, 496 U.S. 128, 136-37 (1990).  Where the incriminating nature is not immediately apparent, "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence."  *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017).  "Officers are entitled to seize items that are in plain view if they have probable cause to suspect that the item is connected with criminal activity."  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 (2d Cir. 2018) (internal citations and quotation marks omitted).

In this case, law enforcement officers arrested Lloyd Kidd at his apartment on December 12, 2018.  A219–A220.  It is undisputed that officers did not have a search warrant.  A242.  After members of law enforcement announced their presence, Mr. Kidd opened his apartment door and was immediately taken out into the building hallway, handcuffed, and arrested.  A221, A239.  Officers then entered the apartment and conducted a "protective sweep."  During that

purportedly "cursory" review of the apartment, officers noted a number of electronic devices, which included cell phones, computers, hard drives, and thumb drives. These electronic devices were seized and, months later, searched pursuant to a search warrant. *See e.g.* A57.

At trial, the government introduced evidence retrieved from some of the devices. Specifically, in support of Count 5 of the indictment, production of child pornography, the government introduced three photos and one video clip, allegedly constituting sexually explicit imagery of Kaira Brown. FBI forensic examiner, Porsche Brown, testified that these images, introduced into evidence as Exhibits 1204-1207[14] were recovered from five different electronic devices seized at Mr. Kidd's apartment on December 12, 2018, including two computers and three storage devices. Other images, contained in Trial Exhibits 1212-1226, were also recovered from Mr. Kidd's devices. A698. According to the government, each of these devices was observed in plain view during the safety sweep of Mr. Kidd's apartment and seized at that time.

---

[14] Duplicates of these images recovered from each device were introduced at trial as Exhibits 1230-1237, 1239-1242, and 1345-1348. A685-691, A695-696. For ease of reference, this brief refers only to the exhibits recovered from the device identified at trial as 1B3, a two-terabyte Western Digital drive labeled "CK Time Machine." A686. Exhibit 1207 is a video constituting alleged child pornography and accordingly was not included in the appendix. However, a series of still images from the video was introduced into evidence as Government's Exhibit 1234, A696, which is available for the Court's reference. *See* A1279.

In pretrial motions, Mr. Kidd moved to suppress the electronic devices seized in his apartment during his arrest. Mr. Kidd argued that even if the electronic devices were observed in plain view, because they consisted of phones, iPods, computers, hard drives and thumb drives, they were not of "an immediately apparent incriminating character," and they were therefore not properly seized. *See* A109–A110.

The government responded that law enforcement had probable cause to believe the electronic devices were connected to criminal activity. Specifically, the government wrote:

> At the time of the arrest and protective sweep, the law enforcement officers on the scene had investigated the defendant for months, spoken with multiple victims about the defendant's conduct, and had information that the defendant's commission of the trafficking offenses regularly involved the use of electronic devices. Agents had specific information that the defendant had recruited Victim-1 to engage in prostitution through an online advertisement posted on the website Backpage.com and had subsequently spoken with this minor victim on a cellphone to arrange for her to come, with several other minor victims, to engage in commercial sex acts. The defendant had taken photographs of minor victims and then used those photographs in commercial sex act advertisements which he posted online. The defendant arranged for customers to come and meet these victims to engage in commercial sex, and then collected the proceeds from this conduct. Aside from this specific information related to this defendant, the law enforcement officers had extensive training and experience in sex trafficking offenses and understood that these offenses frequently involve the use of electronic devices to facilitate the offenses, to post advertisements, to communicate with potential

40

customers, and to recruit or communicate with minor victims, among other things.

A131. The defense replied that the only concrete facts pointed to by the government "were statements from alleged victims that someone named "Red" had posted a Backpage ad with a phone number and then had taken photos of them. But those interviews could only have described phone calls from *years* earlier. At that time, there was no allegation of any sex trafficking after May 2017."[15] A167 (internal citation omitted). Moreover, the defense pointed out that the alleged information only related to cell phones, whereas numerous computers, hard drives, and SD cards were seized as well. *See* A167–A168.

The district court denied Mr. Kidd's motion. Citing to a location warrant application filed a week before Mr. Kidd's arrest, the court concluded that "the investigation here provided probable cause that the Seized Electronic Devices contained or constituted evidence of the crime." SPA14 (*United States v. Kidd*, 386 F. Supp. 3d 364, 372 (S.D.N.Y. June 18, 2019)). Particularly, "the December 4 Location Data Warrant already specified that Kidd (1) listed a cellphone number on online advertisements; (2) spoke with a minor victim who called that number; (3) took photographs of the minor victims; and (4) posted those photographs online."

---

[15] The initial indictment in the case only charged conduct between 2015 and 2017. *See* No. 18-Cr-872 (VM), ECF No. 1 (SDNY).

The district court's decision was erroneous.  For one, both the government and the court grouped all devices seized on the day of Mr. Kidd's arrest – cell phones, computers, hard drives, SD cards, iPods – into one "electronic devices" category.  They were, however, different and require different analysis.  Based on the information known to officers at the time of arrest and articulated by the government in its opposition to Mr. Kidd's motion to suppress, Mr. Kidd had corresponded with an alleged victim by phone, had posted an advertisement on Backpage.com, and had taken photographs of a victim, which were uploaded to Backpage.com.  All of these actions implicate only smart phones, which can be used to have conversations, which have cameras, and which have access to the internet.  The government offered no facts known to officers before the arrest that Mr. Kidd had used a computer for any of his alleged sex trafficking activities.  The government also had no facts to support the conclusion that he had downloaded and saved images or other evidence onto hard drives, thumb drives, or SD cards.  The only concrete allegation to support probable cause to seize devices therefore was that Mr. Kidd had used a cell phone to speak to the alleged victim.  *C.f. Babilonia*, 854 F.3d at 180 (permitting the seizure of cell phones without a warrant because "[t]he investigation had revealed that the murder-for-hire conspiracies involved the use of multiple cell phones. A separate wiretap investigation that Kenney was aware of showed that Key and his co-conspirators used cell phones to

conduct drug-related activity. Kenney had analyzed Key's use of numerous cell phones in connection with his purported criminal activity.").

Thus, even if the "incriminating character" of the *cell phones* observed in plain view was "immediately apparent" based on the information law enforcement possessed at the time, that same argument cannot be made to support lawful seizure of other devices, including two laptop computers and electronic storage devices such as hard drives and thumb drives. As Judge Dearie observed,

> [p]ermitting any and all electronics to be seized without a warrant merely because a defendant used the Internet or the telephone at some point would impermissibly open the door routinely to warrantless seizures of electronics in almost any criminal investigation.

*United States v. Byam*, 2013 WL 4459002, at *4 (E.D.N.Y. Aug. 15, 2013). Beyond the general supposition that someone engaged in sex trafficking may, at some point, use a computer, the officers here possessed no specific information to establish probable cause to believe that the computers, let alone the memory devices, were incriminating.

It is clear that officers came to Mr. Kidd's apartment ready to seize all electronic devices without a warrant, without any specific knowledge that Mr. Kidd had used such devices, other than cell phones, in committing crimes. A hunch that a computer may have been used to commit a crime, without more, is insufficient to establish probable cause. Here, the government proffered no facts

that connected his computers and electronic storage devices to the alleged crime. That failure meant that officers' seizure of these devices without a warrant was unlawful, and the court should have suppressed this evidence.  This Court should reverse Mr. Kidd's conviction and remand for a new trial.

**III.    The Court Erroneously Admitted Summary Charts/Reconstructions of Alleged Backpage.com Data Over Defense Objection**

Over objection, the government was permitted to introduce summary charts or reconstructions of data that was allegedly recovered from computer servers maintained by Backpage.com, and seized by the FBI in 2018.  The problem was not the introduction of summary charts or reconstructions.  Such evidence is generally admissible under Rule 1006 of the Federal Rules of Evidence.  The problem was that the underlying data, on which the charts were based, was not admissible without proper foundation, and that foundation was never laid.  For the reasons set forth below, the summary charts contained in government Trial Exhibits 400-422 should not have been admitted into evidence.

A.  Legal Standard

Federal Rule of Evidence 1006 permits a party to summarize unwieldy data in charts or spreadsheets, or by some other mechanism that makes it easier to present the data to a jury.  The law is clear, however, that the underlying data on which the summaries are based must be admissible.  *See e.g.*, *United States v. Fechner*, 952 F.3d 954, 959 (8th Cir. 2020) ("The party offering a Rule 1006 summary has the burden of showing that the contents of the summary are admissible."); *United States v. Babichenko*, 543 F. Supp. 3d 946, 957 (D. Idaho 2021) ("Of course, for a summary exhibit to be proper under Rule 1006, the

underlying materials must be admissible into evidence, even if they are not so admitted.")  Evidence is admissible if it is relevant and is not precluded from admission by some other rule, such as the restrictions against hearsay.  *See e.g. United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012) ("The materials summarized by Rule 1006 evidence must themselves be admissible because a contrary rule would inappropriately provide litigants with a means of avoiding rules governing the admission of evidence such as hearsay.") (internal quotation marks and citation omitted).

B. <u>Application</u>

In this case, crucial evidence against Mr. Kidd came in the form of "reconstructions," created by FBI forensic examiner, Erik Uitto. These charts sought to roughly reconstruct for the jury the way that advertisements, posted on Backpage.com, might have looked visually.[16]  The reconstructions were put together using data allegedly downloaded from Backpage.com servers seized by the FBI and contained in spreadsheets.  The reconstructed ads were powerful evidence against Mr. Kidd because they provided corroboration for witnesses who testified that Mr. Kidd served as their pimp in the prostitution business. Specifically concerning the counts of conviction, some of the reconstructions,

---

[16] Backpage.com had been taken down by the FBI in 2018, and actual advertisements from the site were no longer available.  A526–A529.

including Exhibits 400, 401, 402, and 404, contained alleged advertisements of Kaira Brown, posted on Backpage.com prior to her 18th birthday.  A1266–A1269.

Before trial, the defense had objected to the introduction of the reconstructions on the basis that they did not accurately reflect the actual advertisements on Backpage.com.  *See* 18-CR-872 (VM), ECF No. 47 at 7 (S.D.N.Y.); A353–A354.  When it became clear that the government had no intention of establishing through a witness with personal knowledge that the servers analyzed by forensic specialist Uitto were, in fact, Backpage.com servers and were the same ones seized by the FBI, the defense objected to introduction of the summary charts/reconstructions on hearsay and lack of foundation grounds. A385.  Specifically, the defense argued that if examiner Uitto had no personal knowledge of how Backpage.com stored its data on servers, and did not participate in the seizure of the servers and their transfer to the FBI Idaho offices where he worked, then his knowledge about whether the servers were, in fact, Backpage.com servers, and how they were seized and secured, was based on hearsay – namely on information provided by other FBI professionals.  As defense counsel argued, "The issue is the underlying data is not admissible without a witness. It is not admissible based on the fact that another law enforcement officer told him this is really from Backpage. We need someone from Backpage, someone with knowledge."  A387. The district court overruled the defense objection.  A388.

During the first day of testimony, the defense continued to object repeatedly to Mr. Uitto's testimony, arguing that Mr. Uitto's entire personal knowledge came from the data that he downloaded from two servers and that he was *told* they were Backpage.com servers seized by the FBI.  *See e.g.*, A521, A533, A543, A552.  The court overruled these objections, stating that "[t]he witness testified that he has seen these BackPage documents. I think he would qualify as a lay expert on these matters, so he would have familiarity with the data that was extracted from these servers."  A533–A534.  This statement, however, seemed to betray a lack of familiarity with the issue.  The witness testified that he had seen some samples of actual Backpage.com advertisements that had been sent to him as part of local law enforcement inquiries, A529, and he testified that he saw and analyzed the data extracted from the two servers, which came in data form, not visual depictions. However, he did not, and could not, testify that he personally knew that the two servers had not been altered or modified, and were, in fact, the servers seized by the FBI from Backpage.  Nor could he testify about what the advertisements he was discussing had looked like on Backpage.com.[17]

---

[17] The court's confusion was also apparent the day after examiner Uitto testified, when the court expressed concern about admitting the reconstructions into evidence under Rule 1006.  It did not seem to be entirely clear about whether Uitto had access to the actual Backpage.com documents (i.e., the advertisements as they appeared on Backpage.com), or just the data from the servers, from which he reconstructed the ads.  *See* A643–A645.

48

This was precisely the issue that concerned District Judge Furman in *United States v. Hubert Dupigny*, No. 18-CR-528 (JMF), a sex-trafficking case tried in the Southern District of New York about six months after Mr. Kidd's trial by, incidentally, the same prosecutors. There, too, the government sought to introduce Backpage.com reconstructions without a foundation witness, seeking to rely only on the forensic examiner who analyzed the data. At a pretrial hearing, the defense objected to the introduction of the summary charts on hearsay and lack of foundation grounds. *Dupigny*, No. 18-CR-528 (JMF), ECF No. 198 at 72 (S.D.N.Y.). When the government tried to describe the argument as simply a chain of custody issue, which goes to weight, not admissibility, Judge Furman stated:

> So usually in a more conventional case of, let's say, a gun that is seized, the government will offer the person who made the initial seizure, and then, say, the lab technician who conducted the test isn't required to bring every link in the chain between A and Z. Here, I hear you saying that you plan to just bring Z, but no one to testify about the initial seizure who has firsthand knowledge.

*Id.* 76. After further argument by the parties, the court reserved decision, stating:

> I think this is potentially a real issue, which is to say I think there is some validity to the objection that you can't just bring in the end of the chain of custody, that there needs to be something that connects it to the seizure in the first instance and establishes relevance. Now, it may be that Ms. Bracewell said that the agent can testify that based on sort of the data itself, that that would suffice to identify that this was in fact Backpage data, and can probably testify that there was a seizure, that Backpage has been taken down, can testify generally to the proposition that when that happens law enforcement takes steps to

49

preserve the data, and can testify that this data shows indicia or markings of being from Backpage. And my guess is that that would suffice for the jury, and then it would be reasonable or the government would be entitled to argue to the jury that this is in fact the seized Backpage data and get it in on that basis, and then it would be a weight, not admissibility issue. But I think the critical piece is whether a proper foundation is laid that would identify this as Backpage data in the first instance, because otherwise I think it does have that potential problem. So why don't I reserve judgment on it.

*Id.* at 79-80.

Three days later, in a letter to the court, the government withdrew its plan to introduce the summary Backpage.com reconstructions. *See Dupigny*, No. 18-CR-528 (JMF), ECF No. 193 (S.D.N.Y.).

The issue is identical here and was thoroughly preserved by defense counsel. As Judge Furman mused in *Dupigny*, if the data contained on spreadsheets in this case was sufficiently self-authenticating, perhaps the foundation would not have been required. But nothing in the record here indicates that Examiner Uitto could glean from the spreadsheets that the data on the servers was in fact from Backpage.com, how and under what circumstances the servers came into the possession of the FBI, and whether they were actually Backpage servers or contained Backpage data from some other source. Without that personal knowledge, Uitto was in no position to authenticate and render the underlying data admissible.

50

If the underlying data was not admissible, then the summary charts or reconstructions were also inadmissible under Rule 1006. *See e.g. United States v. Groysman*, 766 F.3d 147, 159 (2d Cir. 2014) (reversing conviction where summary charts were improperly admitted by the trial court: "[t]hese charts were prepared at the direction of Ginzburg, and his testimony provided the only foundation for their admission, despite the fact that he had no personal knowledge of many of the matters conveyed on those exhibits….") (internal quotation marks and citations omitted); *United States v. Ging-Hwang Tsoa*, 2013 WL 6145664, at *6 (E.D. Va. Nov. 20, 2013) ("Accordingly, just as the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception, so too must the proponent of a Rule 1006 summary based on hearsay evidence establish that the materials summarized are admissible.").

It is true that "breaks" in the chain of custody generally affect the weight of the evidence, not its admissibility. But here there was no "break." Here the government failed to offer the first link in the chain, and that is a foundational concern, as Judge Furman articulated. Without that initial link in the chain, the testifying witness lacks personal knowledge about how the evidence came into the hands of law enforcement in the first place. Any testimony by the forensic examiner about those circumstances is, therefore, based on hearsay, and is inadmissible. The district court should have granted the defense request and

excluded the summary charts/reconstructions.  Accordingly, this Court should reverse Mr. Kidd's conviction and remand for a new trial.

## IV.    The Trial Court's Denial of Lloyd Kidd's Rule 33 Motion Was an Abuse of Discretion

Lloyd Kidd was convicted by jury of Counts 1 and 5 of the indictment on July 15, 2019.  On July 26, 2019, upon the request of Mr. Kidd, the trial court appointed new counsel under the Criminal Justice Act.  SPA25–SPA26.  New counsel orally argued a motion pursuant to Fed. R. Crim. P. 29 to dismiss based on improper venue on October 11, 2019 (*see* Point I, above), and then awaited sentencing.  On November 7, 2019, the trial court adjourned Mr. Kidd's sentencing until after the presentence report would be issued, without setting a date.  *See* No. 18-CR-872 (VM), ECF. No. 99 (S.D.N.Y. Nov. 7, 2019).  Before a sentencing date was set, the COVID-19 pandemic hit the United States, and most court proceedings were impacted and significantly delayed.  Mr. Kidd was finally sentenced on January 28, 2022.

On May 19, 2021, the defense filed an extensive motion to vacate Mr. Kidd's conviction under Fed. R. Crim P. 33, arguing that the government's failure to abide by its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and the ineffectiveness of Mr. Kidd's trial counsel, led to the probability that a manifest injustice had occurred in Mr. Kidd's convictions of Count 5 and, to a lesser degree, Count 1.  The motion was untimely, as the defense conceded, but it urged the trial court to find "excusable neglect," given the particular circumstances of the situation, and the lack of actual prejudice to the government.  On July 13, 2021, the

53

trial court denied the motion, finding it to be untimely and, alternatively, to fail on the merits.  *See* SPA31–SPA32.  For the reasons set forth below, the court's decision to deny the motion without a hearing was an abuse of discretion, and this Court should remand the case for a new trial or, alternatively, for further proceedings.

A. The Rule 33 Motion

At the trial, the government introduced two sets of images, both allegedly depicting Kaira Brown (Victim 1), who was named in both counts of conviction. The first set of pictures, contained in government Trial Exhibits 1212-1225, showed a woman, self-identified by Kaira Brown, in a series of sexually suggestive poses.  In two of those pictures, Exhibits 1213 and 1217, Kaira Brown faced the camera and her naked thighs were visible.  A1280, 1282.  In both photographs, Ms. Brown had a large, intricate, and noticeable tattoo on her right thigh.

The second set of images, Trial Exhibits 1204-1207, was also self-identified by Ms. Brown and formed the basis for the production of child pornography charge in Count 5.  Exhibit 1204 showed a nude female body (in which the face could not be made out) *without* a large tattoo on her visible right thigh.  The metadata attached to the images and introduced at trial showed that Exhibits 1204-1207 were

created February 1-2, 2017, A691–A694, while Exhibit 1213 was posted to Backpage.com on April 27, 2017, less than three months later.[18]

The motion made two claims, only one of which is being pursued on appeal.[19] Specifically, once it became clear that the government was alleging that both sets of exhibits, (Exhibits 1204-1207 and 1213, 1217), were supposed to depict Kaira Brown, trial counsel failed to recognize the profound discrepancy between the images. Counsel's failure to register that enormous inconsistency was legally ineffective, because no rational or strategic reason existed not to establish the inconsistency before the jury and thereby cast serious doubt on the accuracy of Ms. Brown's identification of herself in the alleged child pornography images. If counsel had noticed and effectively used the discrepancy between the two sets of photos, the jury would likely have acquitted Mr. Kidd of Count 5. Moreover, because the photos provided corroboration for the trafficking of a minor charge in Count 1, and because the jury was clearly skeptical of Ms. Brown's testimony, since it acquitted Mr. Kidd of the allegation that he used threats and violence against her, the inconsistency in the photos would have further undermined Ms. Brown's credibility and would likely have led to a full acquittal of Count 1 as well.

---

[18] Exhibit 409, which was a reconstructed Backpage.com advertisement, showed the image in Exhibit 1213 with a posting date on Backpage.com of April 27, 2017. A1272.

[19] On appeal, Mr. Kidd is not pressing the *Brady* claim argued below.

If the discrepancy between Exhibits 1204-1207 on the one hand, and Exhibits 1213 and 1217 on the other, had sufficiently registered with trial counsel, he could have used the inconsistency to great advantage. Given the government's failure to introduce evidence of the tattoo or when it was created, counsel could have confronted Kaira Brown about the tattoo on cross-examination, thereby immediately casting doubt on her credibility. Even if, at this point, Ms. Brown tried to explain that she had obtained the tattoo between the taking of the two photos, without evidence to corroborate such a claim her explanation might have rung hollow. Given the complete absence of any discussions about the tattoo in the discovery and 3500 material, counsel could have been fairly confident that Ms. Brown was in no position to offer a reasonable explanation for the discrepancy.

Even more likely, and more powerfully, counsel could have waited until summations to show the discrepancy to the jury. At this point it would have been too late for the government to try to prove that the tattoo was obtained between the taking of the two photos, and the jury would have been left with evidence that Kaira Brown had a large tattoo on her thigh in one photograph but not in another. The images in Exhibits 1204-1207 were not self-authenticating because no face could be made out. In order to believe that the person in Exhibit 1204 was Kaira Brown, the jury had to believe her and believe that she was correctly identifying a blurry, pixelated image. Believing Ms. Brown would have been made considerably

56

more difficult by the tattoo discrepancy, and counsel, had his defense pivoted, could have made a compelling case that the photos in Exhibits 1204-1207 were not of Kaira Brown, that Mr. Kidd was therefore innocent of Count 5, and that there was reasonable doubt as to Count 1. Accordingly, Mr. Kidd argued in the Rule 33 motion, "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017).

### B. The Trial Court Should Have Found Excusable Neglect

This Court reviews the denial of a Rule 33 motion for a new trial for abuse of discretion. *See United States v. Parse*, 789 F.3d 83, 110 (2d Cir. 2015). A trial court has broad discretion to grant or deny a Rule 33 motion, or to conduct an evidentiary hearing. Generally speaking, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citations omitted). In this case, letting the verdict stand was, in great likelihood, a manifest injustice. At the very least, the trial court should have conducted an evidentiary hearing to determine whether Lloyd Kidd was actually innocent of Count 5.

The trial court rejected these arguments, finding first that, procedurally, the motion to dismiss was untimely. As a general rule, Rule 33 motions must either be filed no later than 14 days after conviction, or the Court must grant an extension

57

during that 14-day period.  *See* Fed. R. Crim. P. 33*,* 45(b).  However, the Court has

absolute discretion to permit the filing of post-trial motions beyond the 14-day

deadline for "excusable neglect."  *See* Fed. R. Crim. P. 45(b)(l)(B).  Although

Rules 33 and 45 do not define "excusable neglect," courts apply an equitable test

that considers all relevant circumstances, including: (1) the danger of prejudice to

the non-moving party, (2) the length of delay and impact on judicial proceedings,

(3) the reason for the delay, including whether it was within the reasonable control

of the moving party, and (4) whether the moving party acted in good faith.  *See*

*Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415 (2d Cir. 2004) (citing

*Pioneer Inv. Servs. Co. v. Brunswzck Assoc. Ltd. P'ship*, 507 U.S. 380, 395

(1993)).

    Here, the trial court misapplied this test.  First, the court, uncritically,

accepted the government's assertion that it would suffer prejudice by adjudication

of the delayed motion:

> Likewise, the delay would result in considerable risk of prejudice to
> the Government were it required to retry this case two years later. As
> time goes by, the likelihood of trial witnesses becoming unavailable
> increases. The Court is persuaded that this risk is even greater in this
> case, considering the youth of the trial witnesses and the sensitive
> nature of their testimony.

SPA30.  This characterization was not correct.  As pointed out by the defense in

reply, the resolution of these claims only required the participation of one alleged

victim – Kaira Brown.  Mr. Kidd was acquitted of all conduct related to other alleged victims and their participation at an evidentiary hearing or retrial was therefore unnecessary and irrelevant.  The government failed to state whether it had even made any efforts to locate Kaira Brown, let alone whether it had lost contact with her.  Moreover, since this very issue would have to be litigated by way of 28 U.S.C. § 2255 petition if the Rule 33 motion was denied on timeliness grounds, the government was going to have to respond to the petition on the merits in any event.  In other words, whatever claims of prejudice were raised at the Rule 33 stage, and whatever difficulties the government may have had to locate its witness, the situation was going to be worse in terms of prejudice to the government after sentencing than before.  *See* A1402.

Second, the court concluded that there was no "justifiable reason" for the delay.  SPA30–SPA32.  The particular circumstances of the discovery of the discrepancy between the photos of Kaira Brown in the trial exhibits were unusual, however.  Defense counsel was appointed after the trial and was thus unfamiliar with the evidence.  The post-trial Rule 29 motion concerned only the legal question of venue, and therefore did not require a thorough analysis of the evidence.  The preparation for sentencing also did not warrant a full-scale investigation of the trial evidence.  Although counsel reviewed the trial transcript, the case involved hundreds of exhibits, and hundreds, if not thousands, of photographs in the

discovery of women advertised for prostitution on Backpage.com. There was no reason for counsel to spend time on a review of that evidence prior to an appeal.

Indeed, it is unlikely the discrepancy would have been discovered at all prior to sentencing if Mr. Kidd had not been adamant about reviewing his discovery, 18 U.S.C. § 3500 material, and trial exhibits during the lengthy period between conviction and sentence. A protective order prohibited Mr. Kidd from keeping much of the discovery and all of the 3500 material at his detention facility, and at least during the initial stage of representation it did not seem like a prudent use of time for counsel to sit with Mr. Kidd at the Metropolitan Detention Center (MDC) while he perused trial evidence when there were no open post-conviction issues to explore prior to sentence. A1352.

In March 2020, the COVID pandemic shut down all legal visits to the jail, and for over a year there was no possibility of bringing evidence to Mr. Kidd and reviewing it together. When the MDC eventually reopened to legal visits in the spring of 2021, counsel brought the trial exhibit binder to Mr. Kidd for review. At that time, the discrepancy was discovered (A1352-1353), and shortly thereafter the Rule 33 motion was filed.

In retrospect, fault could be ascribed to counsel for failing to spend time with Mr. Kidd to review trial evidence in the months after conviction before the onset of the pandemic. However, this kind of analysis was not necessary for

sentencing purposes and was therefore not a priority of representation. Mr. Kidd's access to justice should not be precluded, however, because counsel failed to recognize the importance of evidence that, under normal circumstances, would not be relevant to preparations for sentencing.

Given the lack of demonstrable prejudice to the government, the lack of impact on judicial proceedings,[20] the extraordinary circumstances of the global pandemic, and, most importantly, the non-frivolousness of the issue that was raised, which could have meant that Mr. Kidd was innocent of at least one of the two counts of conviction, the trial court should have found "excusable neglect" under Rule 45.

### C. The Trial Court Should Have Concluded that Lloyd Kidd Received Ineffective Assistance of Counsel, or Should Have Held a Hearing

On the merits, the trial court was wrong to determine that an ineffective assistance of counsel claim was not established. *See* SPA35–SPA36. The court provided two reasons for dismissing the claim. First, the court cited the fact that Lloyd Kidd himself, on cross-examination, testified that the female in Exhibits 1204-1207 was Kaira Brown. *Id.*; A1038 ("Q. And if we could pull up

---

[20] Concerning the second factor set forth in *Williams,* 391 F.3d at 415, while the delay was certainly extensive, there was no impact on judicial proceedings because the filing of the Rule 33 motion did nothing to delay Mr. Kidd's sentencing. As to whether the defense was moving in good faith, the court made no finding as to that factor, and the circumstances hopefully make clear that the motion was not filed in bad faith.

Government Exhibit 1204 just for the witness, jury, Court and defense counsel. That's one of the images that you took of her, right? A. More than likely. Q. Yes or no. A. Yes, yes."). While reliance on this testimony provided an easy path to the denial of the motion, that reliance was misguided and the court should have more seriously considered the arguments offered by the defense on this point.

First, Mr. Kidd's reluctant identification of Exhibit 1204 was hardly reliable. He had not seen Exhibits 1204-1207 until the middle of the trial, and even then saw them just briefly. *See* A1368–A1369. Because they constituted alleged child pornography, he could not possess them, and his counsel could not show them to him prior to trial. Mr. Kidd's computers and hard drives contained hundreds or thousands of pictures of women – many nude or semi-nude. Given that the image in Exhibit 1204 depicted a faceless female body, he could not be sure one way or another whether the photo in Exhibit 1204 was really of Kaira Brown, and so he simply acceded to the prosecutor's pressure on cross-examination. *See id.*

That, however, would never have happened if counsel had been using the discrepancy between Exhibits 1204 and 1213/1217 as a centerpiece of his defense. If he had registered the fact that Kaira Brown's claim to be the person in Exhibit 1204 was undermined by the absence of the tattoo, counsel's entire defense on these counts would have changed from questioning the reliability of the date to challenging whether the photo actually depicted Kaira Brown. If that had been the

direction of the defense, counsel would have spent considerable time with Mr. Kidd focusing on this precise issue, studying the photos in the relevant Exhibits, and determining whether Mr. Kidd actually believed that Exhibits 1204-1207 were photos of Ms. Brown. That level of attention to this issue would have either caused Mr. Kidd not to testify, or it would have led to a different answer when confronted with the exhibits on cross-examination.

Under these circumstances, and given the significant unanswered question posed by the tattoo discrepancy – namely, was Kaira Brown the person in Exhibits 1204-1207 or not – it was simply too facile to cite to Mr. Kidd's testimony and wrap up the issue.

The trial court's second reason for rejecting the ineffective assistance claim was testimony given by Sabrina Misere (a witness who was evidently disbelieved by the jury, since it acquitted Mr. Kidd of the charged offense to which she testified), who claimed, without evidence, that Mr. Kidd sometimes tried to conceal the identities of women whose pictures he posted on Backpage.com by blurring their faces or superimposing a tattoo. *See* SPA35 (citing testimony reproduced herein at A863: "Q. What, if anything, did he say about concealing your identity in those photographs? A. He could blur your face up. If you don't have anything, tattoo or something, he could create one.").

63

This basis, however, was utterly speculative. There was no testimony that Lloyd Kidd superimposed tattoos on Kaira Brown. More importantly, a close analysis of the two exhibits in which Kaira Brown's large thigh tattoo was visible (Exhibits 1213 and 1217) suggests that superimposing the tattoo on the photograph would have been nearly impossible. Exhibit 1213 shows the entire tattoo, which is large and complex, on Ms. Brown's thigh. A1280. Exhibit 1217, likely taken at a different time because Ms. Brown is wearing different clothes, only shows part of the tattoo because of her body position. A1282. It would have taken extraordinary design and computer skills to superimpose only part of the tattoo on Ms. Brown's thigh in the second photo, so as to remain consistent with her body position. One throw-away comment by Sabrina Misere, for which there was literally no basis in the record, should not serve as the justification for rejecting a valid and potentially exculpatory argument.

In fact, the ineffective assistance of counsel likely led to an erroneous conviction. Trial counsel's performance in this one very important aspect "fell below an objective standard of reasonableness[,]" meaning it was "so deficient that it falls outside the 'wide range of professionally competent assistance.'" *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668 at 690 (1984)). In the absence of a proactive explanation from the government, any competent defense attorney would have made the discrepancy

between the exhibits the primary theory of defense for Count 5 and would have used it to bolster the argument that Kaira Brown's testimony was incredible and therefore could not be relied upon for Count 1.

Moreover, for the reasons already discussed, counsel's failure to register and effectively use the discrepancy resulted in actual prejudice such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kovacs*, 744 F.3d at 51 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome …." *Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017) (internal quotation marks and citations omitted). That is most clear for Count 5, where conviction was impossible if the images in Exhibits 1204-1207 did not depict Kaira Brown. But there is also a reasonable probability that the verdict for Count 1 would have been different in light of the fact that the images in Exhibits 1204-1207 could not have provided direct corroborating evidence that Ms. Brown was sexually trafficked before she was 18 if the images did not depict her.

As trial counsel recognized in retrospect, a defense based on the notion that Kaira Brown was not the person depicted in Exhibits 1204-1207 would have been far superior to one focused on trying to disprove the accuracy of computer metadata. *See* A1351–A1354. In the absence of a government explanation, the blatant discrepancy between the two sets of photos allegedly portraying Kaira

Brown rendered such a defense not only compelling but likely to lead to a different outcome.  Because counsel failed to pursue this defense, Mr. Kidd received constitutionally recognizable ineffective assistance of counsel, and the Rule 33 motion should have been granted.   Accordingly, this Court should reverse Mr. Kidd's convictions and remand for a new trial

At the very least, since the motion called into question the integrity of Mr. Kidd's conviction, the trial court had an obligation to investigate *whether* his conviction should be vacated by conducting an evidentiary hearing.  At such a hearing, Kaira Brown could have explained when she obtained the large tattoo and the court could have determined whether that explanation precluded Mr. Kidd's guilt.  Its failure to hold a hearing was an abuse of discretion, and this Court should remand for further proceedings.

## V.   Lloyd Kidd Received Ineffective Assistance of Counsel

Although trial counsel for Mr. Kidd defended his client with great skill in many respects, he pursued a trial strategy that made conviction on Counts 1 and 5 a foregone conclusion.  In so doing, he missed an opportunity to offer a theory of defense to the jury that, under the circumstances, would likely have resulted in acquittals.  This fundamental error amounted to ineffective assistance of counsel and should result in a new trial for Mr. Kidd.

The standard for ineffective assistance of counsel was announced by the Supreme Court in *Strickland,* 466 U.S. 668 (1984).  *Strickland* established a two-part test to determine whether counsel's performance amounts to ineffective assistance.  First, counsel's performance must be deficient, measured by an objective standard of reasonableness.  *Id* at 687.  Second, counsel's deficient performance must have prejudiced the defendant.  *See Pham v. United States,* 317 F.3d 178, 182 (2d Cir. 2003).  Prejudice is shown when there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

A. Count 1

Trial counsel pursued a defense strategy as to Count 1 that had no realistic chance of success.  The strategy was that, as Mr. Kidd testified, he did not meet

Kaira Brown until April 2017, after she was 18.  A951.  Thus, even though she

worked as a prostitute out of his apartment and he posted advertisements of her

online, he did not traffic a minor.  The insurmountable problem with that strategy

was that photos of Kaira Brown that were found on Mr. Kidd's computer, and

which corresponded to photos obtained from the Backpage.com servers, contained

metadata that showed the creation dates of those photos to be February 2017, one

month before Kaira Brown's 18th birthday.  That metadata matched up with the

data obtained from Backpage.com.  Unless both the metadata and the

Backpage.com data could be proven to be wrong, there appeared to be

incontrovertible evidence that Ms. Brown worked for Mr. Kidd before she turned

18.  The defense did not call an expert to try to establish the fallibility or

unreliability of metadata but simply depended on Mr. Kidd's testimony.  Left with

no alternative, the jury convicted Mr. Kidd of Count 1, even though it was

otherwise highly skeptical of Kaira Brown's testimony.

There existed, however, an alternative defense theory missed by trial counsel

that was both consistent with the evidence and far more likely to succeed.  Kaira

Brown testified that she met Mr. Kidd in the spring of 2015 when he responded to

an advertisement that was posted of her.  They met in Brooklyn, and she began

working as a prostitute that day.  She further testified that on that very first day,

Mr. Kidd took suggestive pictures of her that he then posted on Backpage.com.

A437, A439–A440, A450. Ms. Brown identified those photos as Exhibits 1221-1222. A497–A498, A1283, A1285. She also indicated that she gave photos that someone else had taken of her to Mr. Kidd so he could post them for her. A457.

In fact, the metadata, so highly touted as unassailable by the government, showed that the pictures Kaira Brown claimed were taken in the spring of 2015 were in actuality taken in February 2017.[21] A1266–A1268; A1284; A1286. Nor did the government present a single shred of evidence to corroborate Kaira Brown's story that she worked as a prostitute for Lloyd Kidd before February 2017. Her testimony was therefore demonstrably false, including her claim that she told Mr. Kidd a few months after she began working with him that she was 16. Her own testimony in combination with the metadata made it highly likely that she did not meet Mr. Kidd until February 2017, less than two months before her 18th birthday.

---

[21] As noted, Exhibit 400 reflected Backpage.com data showing that these photos (Exhibits 1221-1222) were created and posted on February 2, 2017. A1266. The metadata embedded in the digital files themselves, shows the photos were taken on February 1, 2017. Although FBI examiner Brown testified that metadata is stored in a digital image and travels with the image wherever it is transferred, A692, the government chose not to introduce the metadata for Exhibits 1221-1222, presumably because the dates undermined its witness's story about when these photos were taken. The metadata for Exhibit 1221-1222 can easily be accessed by right-clicking on the digital image and selecting properties/details. A1283–A1286. It is produced here for demonstration purposes to show that trial counsel missed a significant opportunity to impeach Kaira Brown's credibility, and, more importantly, to consider an alternative defense strategy with a greater likelihood of success.

Rather than taking on the impossibility that the metadata on the photos must somehow have been inaccurate, it would have been a far more effective defense to urge the jury to conclude that Mr. Kidd, in the few weeks before Kaira Brown turned 18, did not know, and did not recklessly disregard, the fact that she was 17 years and 10 ½ months old, or that, under the circumstances, six weeks was not enough time to provide Mr. Kidd with a "reasonable opportunity to observe" Ms. Brown to allow him to conclude that she was not 18. *See* 18 U.S.C. § 1591(c).

Indeed, in the absence of Kaira Brown's incredible testimony, the record contains no indication that Mr. Kidd had any reason to believe she was a minor. All of his advertisements for recruiting prostitutes made abundantly clear that he was seeking women 18 and older. *See* A1270; A1271; A1273–A1275; A1293–A1296. In terms of maturity and appearance, the difference between 18 and six weeks shy of 18 is negligible. A jury already disinclined to believe Kaira Brown might very well have determined that in the absence of proof that Mr. Kidd was told her age, he could not have known, and it would not have been reasonable to know, that Ms. Brown was not yet 18.

Had counsel pursued this strategy, rather than the farfetched notion that metadata imbedded in digital photographs or data collected by Backpage.com were somehow incorrect, his entire defense would have been altered. Mr. Kidd might not have testified at all, and counsel and Mr. Kidd together could have made sure

their strategy was consistent.  Even if Mr. Kidd had insisted on testifying that he did not meet Ms. Brown until April 2017, counsel could have argued to the jury in the alternative that even if it did not credit his testimony on that point, there was insufficient evidence to establish that Mr. Kidd knew or had reason to know Ms. Brown's age.  The jury, which, as noted, did not find Ms. Brown credible on her claim that she was threatened and coerced, could very well have concluded that based on a lack of knowledge theory, in light of the short time between the taking of the pictures and Ms. Brown's 18th birthday, the government did not prove guilt beyond a reasonable doubt.

B. <u>Count 5</u>

Similarly, trial counsel was ineffective as to Count 5 by failing to pursue a potentially winning strategy.  As more fully discussed in Point IV above, trial counsel should have discerned the discrepancy between the two sets of pictures and argued to the jury that, in light of the tattoo discrepancy, the government had not proved beyond a reasonable doubt that it was Kaira Brown in the purported child pornography pictures.  Like for Count 1, it was not an effective trial strategy to concede that the female body in Exhibits 1204-1207 was Kaira Brown, and that Mr. Kidd took those photos, but to argue that the metadata was simply incorrect. Without expert evidence about the unreliability of metadata, such a strategy was bound to fail.  Rather, had defense counsel been aware of the fact that photos taken

71

less than 3 months apart were so profoundly different that they likely did not depict the same person, he would or should have argued instead that the person in Exhibits 1204-1207 was not Kaira Brown.

If counsel had pursued this strategy, conviction would have required the jury to find Ms. Brown credible about her self-identification. But her credibility was severely compromised in many different aspects. As noted, there was no corroborative evidence to support Ms. Brown's claim that she met Mr. Kidd in 2015. She claimed, for example that she only knew Mr. Kidd to have lived on Nostrand Avenue, but Mr. Kidd did not move to Nostrand Avenue until 2016. *See* A1146. Moreover, Kaira Brown had incentives to lie. As she told law enforcement, she was afraid to cooperate with the police because she feared getting in trouble herself. She also told them that when she worked for another pimp who was allegedly trafficking minors, he would leave her in charge of the women and girls when he was not around, creating a real fear that she, too, could be implicated in a trafficking charge. *See* A1406. Most importantly, as discussed above, Ms. Brown's testimony was demonstrably false concerning the dates when photos she claimed were taken and posted by Mr. Kidd on the first day they met. The discrepancy between the dates was not minimal. If the imbedded metadata and Backpage.com data are to be believed, her meeting with Mr. Kidd did not take place until February 1, 2017, nearly two years after she said it did.

Not surprisingly, the jury was highly skeptical of her testimony – as reflected in its verdict rejecting her accusation that Mr. Kidd threatened or abused her. Her claim that she was able to identify herself in the child pornography photos was therefore ripe for challenge.

Courts generally will not second-guess a lawyer's trial strategy, and the fact that it failed does not mean, in retrospect, that it was ill-advised. The circumstances here are different, however. Counsel selected and argued a defense theory that had no chance of success in light of the essentially objective data demonstrating that Kaira Brown was working with Mr. Kidd shortly before her 18th birthday. Conceding that the unidentifiable female body in Exhibits 1204-1207 was Kaira Brown guaranteed conviction. Pursuing a defense strategy that guarantees conviction, when alternative theories with a much greater chance of success are available, defines ineffective assistance of counsel. Accordingly, this Court should reverse Mr. Kidd's convictions and remand for a new trial.

## **CONCLUSION**

For the reasons stated in Point I above, appellant respectfully requests that this Court vacate Mr. Kidd's convictions of Count 1 and Count 5 of the superseding indictment and dismiss those counts. In the alternative, for the reasons stated in Points II-V, appellant respectfully requests that this Court reverse Mr. Kidd's convictions and remand for a new trial. Again in the alternative, if this Court rules that the district court should have held an evidentiary hearing before granting or denying the Rule 33 Motion discussed in Point IV, this Court should remand for proceedings consistent with such a ruling.

Dated:      New York, New York
            June 24, 2022

                          Respectfully submitted,


                          \S\ Florian Miedel
                          Florian Miedel, Esq.
                          *Counsel for Appellant Lloyd Kidd*

                          MIEDEL & MYSLIWIEC LLP
                          80 Broad Street, Suite 1900
                          New York, New York 10004
                          212-616-3042

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), and given the fact that on June 15, 2022, this Court granted appellant's motion, dated June 14, 2022, for leave to file an oversized brief of 21,000 words:

- This document contains 17,383 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

- This document has been prepared in Microsoft Word using a proportionally spaced typeface (Times New Roman), size 14 points.

Dated:    New York, New York
          June 24, 2022

                              Respectfully submitted,



                              \S\ Florian Miedel
                              Florian Miedel, Esq.
                              *Counsel for Appellant Lloyd Kidd*

                              MIEDEL & MYSLIWIEC LLP
                              80 Broad Street, Suite 1900
                              New York, New York 10004
                              212-616-3042

# SPECIAL APPENDIX

# **Table of Contents**

**Page**

Decision and Order of the Honorable Victor Marrero,
 filed June 18, 2019 .........................................................................   SPA1

Decision and Order of the Honorable Victor Marrero,
 filed July 13, 2021 .....................................................................   SPA24

Judgment of the United States District Court,
 Southern District of New York, filed January 31, 2022 ............   SPA37

**SPA1**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/18/19
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA,           :
                                    :
                                    :    18 CR. 872 (VM)
     - against -                    :
                                    :    **DECISION AND ORDER**
LLOYD KIDD,                         :
                                    :
               Defendant.           :
------------------------------X

**VICTOR MARRERO, United States District Judge.**

On December 11, 2018, a grand jury returned an indictment charging defendant Lloyd Kidd ("Kidd") with two counts of commercial sex act exploitation of minors in violation of 18 U.S.C. Section 1591 ("Section 1591"). (See "Original Indictment," Dkt. No. 1.) Count One describes the violation as concerning "Victim-1"; Count Two for "Victim-2." On June 5, 2019, a grand jury returned a four-count superseding indictment, adding to the Original Indictment two counts charging commercial sex act exploitation in violation of Section 1591. (See "Superseding Indictment," Dkt. No. 29.) Trial is scheduled to begin on Monday, July 8, 2019.

Kidd now moves to (1) dismiss the Original Indictment; (2) obtain a bill of particulars; and (3) suppress certain evidence. (See "Notice of Motion," Dkt. No. 20; "Motion to

Suppress," Dkt. No. 23.)[1] The Government opposes these requests. (See "Gov. Opp'n," Dkt. No. 25.)

The Court held a hearing on June 13, 2019, during which it denied in part the Motion to Suppress. The Court now states its findings, reasoning, and conclusions in support of that ruling.

## I.   BACKGROUND

Because Kidd's Motion to Suppress challenges multiple warrants and searches in this matter, the Court briefly summarizes each of them below.

On December 4, 2018, Magistrate Judge Ona T. Wang issued a warrant authorizing the Government to obtain historical and prospective cellphone location information for two cellphone numbers associated with Kidd, including a number ending in -7216 (the "7216 Number"). (See "December 4 Location Data Warrant," Dkt. No. 21-2.)

On December 11, 2018, Magistrate Judge James L. Cott signed an arrest warrant (the "December 11 Arrest Warrant") for Kidd, which was executed early the next morning at an apartment in Brooklyn, New York (the "Apartment").

---

[1] Kidd separately moves to dismiss the Superseding Indictment (see Dkt. No. 30), but briefing has not been concluded on that motion and the Court does not address that motion in this Order.

2

On the morning of his arrest, Kidd answered the door to members of the New York Police Department and the Federal Bureau of Investigation (the "Officers"), who immediately handcuffed him and then did a protective sweep of the Apartment. During that protective sweep, the Officers found three women in the apartment. Additionally, the Officers allegedly saw two safes in plain view, one in Kidd's bedroom (the "Bedroom Safe") and one in Kidd's bedroom closet (the "Closet Safe," and together with the "Bedroom Safe," the "Safes"). The women found in the Apartment told the Officers that certain evidence and money from Kidd's alleged criminal activity could be found in the Safes.

Later that day, the Officers obtained a warrant to search the Safes. (See "December 12 Safe Warrant," Dkt. No. 25-4.) Inside the Safes were certain electronic devices, such as hard drives, computers, and cellphones. The Officers also found numerous other electronic devices in the Apartment. In total, the Officers found twenty-two electronic devices (the "Seized Electronic Devices") in the Apartment and Safes.

Almost three months later, on March 7, 2019, the Government obtained a warrant to search the Seized Electronic Devices. (See "March 7 Electronic Devices Warrant," Dkt. No. 25-3.)

## II.  **DISCUSSION**

Kidd's arguments fall into two categories. The first category challenges the sufficiency of the Original Indictment itself. The second challenges aspects of warrants and searches. The Court addresses each in turn.

A.    ORIGINAL INDICTMENT

Kidd argues that the Original Indictment fails to give notice of the charges he must defend against at trial and is not specific enough to protect his double jeopardy rights should he prevail at trial. (See Motion to Suppress at 3-4 (citing Russell v. United States, 496 U.S. 749, 765 (1962)).) Specifically, Kidd demands the disclosure of details such as the ages or identities of Victim-1 and Victim-2, the dates he met with them, and what type of force or threat he allegedly used to recruit them. According to Kidd, without these details, the Original Indictment must be dismissed. Alternatively, Kidd asks that the Government provide a bill of particulars including such details.

The Government responds that the Original Indictment is valid because it adequately and permissibly tracks the language of the statute under which the Government is charging Kidd. (See Gov. Opp'n at 5.)

As the Court of Appeals for the Second Circuit has explained, "the dismissal of an indictment is an

4

**SPA5**

extraordinary remedy" reserved for circumstances that implicate "fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks omitted). An indictment need "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks omitted).

The Court is not persuaded that the details Kidd seeks must be contained in the Original Indictment. First, the Second Circuit routinely upholds the "on or about" language used to describe the window of when a violation occurred. See United States v. Nersesian, 824 F.2d 1294, 1323 (2d Cir. 1987) (holding that "on or about June 1984" put a defendant on notice for potential crimes in July or early August of 1984 "because the [G]overnment is not required to prove the exact date, if a date reasonably near is established").

Next, the notes to the Federal Rules of Criminal Procedure specifically permit the Government to allege "that the defendant committed [the offense] by one or more specified means." United States v. Pierre-Louis, No. 16 CR. 541, 2018 WL 4043140, at *4 (S.D.N.Y. Aug. 9, 2018) (quoting Fed. R. Crim. P. 7(c) note to subdivision (c)(1)). Thus, to prevent

dismissal, the Government need not provide the details of what type of force or threat Kidd allegedly used.

Similarly, the lack of any identity or date of birth information of the alleged victims does not warrant dismissal of the Original Indictment. The identity of a victim is not required in an indictment unless it is "of such importance to the fairness of the proceeding that it must be spelled out in the indictment." United States v. Stringer, 730 F.3d 120, 126 (2d Cir. 2013).

Stringer is particularly relevant to this case. There, the Second Circuit held that the identity of a victim was not required to be contained in an indictment, despite the centrality of the victim's identity to the charge: the defendant was charged with using "a means of identification of another person . . . during and in relation to . . . bank fraud." Id. at 122 (citing 18 U.S.C. § 1028A(c)). The Court is not persuaded that the identities of Victim-1 or Victim-2 are more critical to Kidd than they were to the defendant facing identity theft charges in Stringer.

However, Stringer also suggests that for identity-theft charges, identity information "is of course an essential element of the charge, unquestionably important, and the defendant is of course entitled on demand to its disclosure in a bill of particulars or otherwise." Id. at 127.

6

The Government offers that it has produced sufficient information to Kidd about the charges he faces in the Original Indictment, obviating the need for a bill of particulars. (See Gov. Opp'n at 8-9.) Not only does Kidd contest the sufficiency of this information, he challenges its veracity, noting that the alleged victims' pseudonyms are inconsistent across documents. (See "Reply," Dkt. No. 31, at 3-4.)

The Court is inclined to agree that the information the Government has provided in discovery should obviate the need for a bill of particulars. However, as ordered during the June 13, 2019 Hearing, the Government shall submit a letter to the Court confirming its prior representations about the ages of the victims specified in the Original Indictment. The Court otherwise denies the part of the Motion to Suppress that seeks to dismiss the Original Indictment.

B.   DECEMBER 4 LOCATION DATA WARRANT

Kidd seeks to suppress both "any location information" and "evidence obtained using the location information" connected to the 7216 Number and resulting from the December 4 Location Data Warrant. Specifically, Kidd claims that the Government made a material misstatement of fact in support of the December 4 Location Data Warrant which necessitates an

7

evidentiary hearing to determine whether to suppress that evidence. (See Motion to Suppress at 17–19.)[2]

Special Agent Brian Mitchell ("Mitchell") authored the agent affidavit in support of the December 4 Location Data Warrant. (See "Mitchell Affidavit," Dkt. No. 25-5, at 7–12.) Mitchell described a website "formerly used to post commercial sex advertisements." (Id. at 4.) According to Mitchell, a minor victim accessed this website and called a cellphone number listed on the online advertisement, which led the minor victim to a meeting with an individual named "Red." During the meeting with Red, the minor victim and others allegedly engaged in prostitution. That minor victim, as well as another victim, then reviewed a photograph of Kidd and identified him as Red. Mitchell examined a number of these online advertisements and found that Kidd listed the 7216 Number "in connection with multiple advertisements." (Id. at 5.) Mitchell also stated that Kidd listed the 7216 Number in connection with an application for food stamps. (See id.)

In contrast to Mitchell's findings, Kidd's review of the discovery in this case has identified no online advertisements listing the 7216 Number. Kidd's counsel raised

---

[2] Although the Government indicated that Kidd had not originally identified a privacy interest in the 7216 Number sufficient to challenge the December 4 Location Data Warrant, the Court accepts defense counsel's representation that the 7216 Number belongs to Kidd. (See Reply at 10.)

this discrepancy with the Government, which has thus far not produced any online advertisement listing the 7216 Number. (See Dkt. No. 26 at 2.)

Kidd argues that, because the Government can point to no online advertisement listing the 7216 Number, Mitchell's findings about the 7216 Number's listing in connection with the online advertisements constitute a lie or reckless statement. Kidd requests a Franks hearing to determine whether probable cause existed to issue the December 4 Location Data Warrant in light of this alleged misstatement. (See Motion to Suppress at 17–19.)

In response, the Government claims that even if Mitchell did not find the 7216 Number listed in connection with the online advertisements, there was probable cause to issue the December 4 Location Data Warrant. In support of a finding of probable cause, the Government highlights that the minor victims talked to Kidd on his cellphone and Kidd listed the 7216 Number on an application for food stamps. (See Gov. Opp'n 27–28.)

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Though a warrant affidavit is presumed to be

9

**SPA10**

correct, <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978), "[i]n certain circumstances . . . a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." <u>United States v. Awadallah</u>, 349 F.3d 42, 64 (2d Cir. 2003).

A material misstatement -- even one made with "reckless disregard for the truth" -- in a warrant application does not automatically entitle a defendant to a <u>Franks</u> hearing. <u>United States v. Rajaratnam</u>, 719 F.3d 139, 157 (2d Cir. 2013). Rather, the district court is permitted to determine whether, based on the record before the magistrate judge, and disregarding the challenged material, there was sufficient evidence to find probable cause without the material misstatement. <u>Id.</u>; <u>see also</u> <u>Franks</u>, 438 U.S. at 154 ("[I]f the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.").

The Court is persuaded that the Mitchell Affidavit supports a finding of probable cause even without the statement that Kidd listed the 7216 Number in connection with an online advertisement. Omitting that statement, the following facts support probable cause to search for location data regarding the 7216 Number: (1) multiple victims

10

identified Kidd in photographs of him; (2) one of the victims
spoke to Kidd after calling a cellphone number on an online
advertisement; and (3) Kidd listed the 7216 Number on an
application for food stamps. Taken together, the food stamps
application connected the 7216 Number to Kidd, who was
otherwise identified by victims. Based on that information,
along with the other facts regarding Kidd's use of technology
and criminal conduct, the Court finds that there was probable
cause for the December 4 Location Data Warrant even without
a Franks hearing.

Accordingly, the Court denies the part of Kidd's Motion
to Suppress that requests a Franks hearing regarding the
December 4 Location Data Warrant.

C.   PROTECTIVE SWEEP

Kidd challenges the Officers' protective sweep of his
apartment, seeking to suppress any evidence obtained from the
search of items seized during the protective sweep. Kidd
raises two arguments. First, he contests the Officers'
assertions that they found the Safes and certain Seized
Electronic Devices in plain view. Second, Kidd argues that
the Seized Electronic Devices exhibited no inherently
incriminating characteristics that justified their seizure.
(See Motion to Suppress at 11-14.)

11

**SPA12**

The first argument, concerning whether the seized items were in plain view, in light of the Officers' sworn statements to the contrary, raises a factual question requiring an evidentiary hearing. The Court will defer ruling on that question until after the evidentiary hearing currently scheduled to be held on June 21, 2019.

Regarding the second argument, the Government contends that probable cause supported the seizure of the Seized Electronic Devices, based on the type of crimes at issue and the expertise of the Officers. (See Gov. Opp'n at 12-13.)

Under the Fourth Amendment, a warrant authorizing the arrest of a defendant at his or her home permits the arresting officers to enter the home, but does not permit the arresting officers to search the home intrusively. See, e.g., United States v. Delva, 858 F.3d 135, 148-49 (2d Cir. 2017).

Rather, once the arresting officers enter the home to effect the arrest, they are permitted to conduct a protective sweep. See id. The scope of such a protective sweep is limited "to that which is necessary to protect the safety of officers and others." Id. at 149 (internal quotation marks omitted). Thus, during a protective sweep, officers may search "spaces where a person may be found" such as "closets and other spaces immediately adjoining the place of arrest from which an attack

12

**SPA13**

could be immediately launched." Id. at 148–49 (internal quotation marks omitted).

The protective sweep doctrine limits the scope of where and how an arresting officer may search the home; the plain view doctrine limits whether they can seize objects they find during the sweep. Under the plain view doctrine, officers may seize an object "if its incriminating character is immediately apparent" as long as the officers are "lawfully in a position" to view and access the object. Id. at 149 (internal quotation marks omitted).

The Court is persuaded that the Officers were permitted to seize the Seized Electronic Devices found in plain view. Kidd argues that the Seized Electronic Devices were not inherently incriminating in nature to justify seizure under the plain view doctrine. However, the "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence." United States v. Babilonia, 854 F.3d 163, 180–81 (2d Cir. 2017) (collecting cases in which courts have upheld the seizure of electronic devices when officers had probable cause to believe the devices contained relevant evidence). In Babilonia, the Second Circuit upheld the warrantless seizure of a cellphone, iPad, and address book. The Second Circuit explained that the investigation into the

defendant's murder-for-hire scheme revealed that the scheme "involved the use of multiple [cellphones]" and separately, that the defendant used cellphones for "drug-related activity." Id. at 180. These facts were sufficient to justify the seizure of the cellphone, iPad, and address book. See id.

Like the investigation in Babilonia, the investigation here provided probable cause that the Seized Electronic Devices contained or constituted evidence of the crime. For example, at a minimum, the December 4 Location Data Warrant already specified that Kidd (1) listed a cellphone number on online advertisements;[3] (2) spoke with a minor victim who called that number; (3) took photographs of the minor victims; and (4) posted those photographs online. (See Mitchell Affidavit at 10-11.) Although the Officers were likely aware of even more relevant facts, these facts alone would permit the Officers -- trained to identify relevant evidence for Kidd's alleged crimes[4] -- and thus likely aware of commonplace experience that electronic devices are used to post and store photographs and other materials online, legal and illegal --

_____

[3] Although Kidd contests whether the online advertisements listed the 7216 Number, he concedes that a cellphone number was listed on the online advertisements. (See Dkt. No. 21 at 2.)

[4] Indeed, the agent affidavit in support of the March 7 Electronic Devices Warrant explains numerous practices involving digital tools that "officers experienced in human trafficking" can readily identify. (See Dkt. No. 25-2 at 10-11.)

14

to have probable cause to conclude that the Seized Electronic Devices contained evidence of the crimes for which Kidd was arrested.

Of course, the Court is mindful that, as Kidd emphasizes, the ubiquity and importance of cellphones in modern culture means that adults may own multiple cellphones and thus "the presence alone of a cell phone, or even several cell phones, in a home is not inherently incriminating." Babilonia, 854 F.3d at 180.

Kidd's emphasis, however, falls short of a reason to suppress any evidence found on the Seized Electronic Devices. At first, Kidd merely states that the Seized Electronic Devices are not incriminating and are subject to heightened privacy protections under Riley v. California, 573 U.S. 373, 394-97 (2014). (See Motion to Suppress at 13.) In his Reply, Kidd attempts to differentiate Babilonia by highlighting the "extensive wiretap investigation" present in that case but lacking here. (Reply at 6.) However, the agent who searched the defendant's apartment in Babilonia was "investigating [the defendant] for narcotics trafficking and a murder-for-hire conspiracy that involved cell phones" and was merely "aware of a wiretap investigation into [defendant's] drug trafficking activities that involved cell phones." Babilonia, 854 F.3d at 172. That is, even if there was an extensive

15

wiretap investigation, it was separate from the agent's
investigation of the defendant for the murder-for-hire
scheme, which also used cellphones. The Second Circuit did
not otherwise emphasize the fact of the wiretap
investigation, and it cited authority in support of such
seizures cases which similarly made no such distinction about
the known extent of the investigation or use of wiretaps. See
id. at 181 (citing United States v. Meregildo, No. 11 Cr.
576, 2012 WL 4378047, at *4 (S.D.N.Y. Sept. 24, 2012)). The
Court finds no unique circumstance that distinguishes the
seizure of the Seized Electronic Devices here from the seizure
of devices in Babilonia and Meregildo.

Therefore, the Court denies Kidd's Motion to Suppress
evidence obtained from the Seized Electronic Devices on the
basis that they are not inherently incriminating. The Court
defers ruling on whether certain of the Seized Electronic
Devices and Safes were in plain view during the protective
sweep until after the evidentiary hearing scheduled for June
21, 2019.

D.   MARCH 7 ELECTRONIC DEVICES WARRANT

Kidd argues that the March 7 Electronic Devices Warrant,
issued to permit the search of the contents of the Seized
Electronic Devices, was defective because of its overbreadth
and lack of particularity. Specifically, Kidd contends that

16

the March 7 Electronic Devices Warrant fails to identify the specific offense for which the Government has probable cause, instead offering a "naked recitation of code sections" rather than specifying "who the victim was, where, when or by what means the alleged sex trafficking took place." (Motion to Suppress at 16.) As a result of this lack of specificity, Kidd asserts it would be impossible for a searching officer to identify which materials on the Seized Electronic Devices are relevant to the March 7 Electronic Devices Warrant and which are not. Regarding overbreadth, Kidd claims the March 7 Electronic Devices Warrant authorizes seizure of information for which probable cause does not exist, such as contact information for co-conspirators and for lengthy historical time periods.

The Government attempts to shift focus from the March 7 Electronic Devices Warrant to the details supplied in the affidavit of Special Agent Brian Gadner that accompanied the Government's warrant application. (See Gov. Opp'n at 23-25 (citing "Gadner Affidavit," Dkt. No. 25-2).) However, the Gadner Affidavit is not referenced in the March 7 Electronic Devices Warrant itself. Although a court may "construe a warrant with reference" to a supporting affidavit, it can do so only if the warrant "uses appropriate words of incorporation." Groh v. Ramirez, 540 U.S. 551, 557-58 (2004).

Therefore, the Court cannot rely on the Gadner Affidavit "to remedy" any "lack of particularity" in the March 7 Electronic Devices Warrant. United States v. George, 975 F.2d 72, 76 (2d Cir. 1992). Instead, when considering overbreadth, the Court can consult the Gadner Affidavit to determine only whether there was probable cause for the specific offenses listed in the March 7 Electronic Devices Warrant.

Generally, trial courts must defer to the issuing magistrate judge for the determination of whether a warrant had probable cause. See, e.g., United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011). However, a warrant can be defective in two respects. First, it can fail to describe the items to be seized with particularity. See e.g., Maryland v. Garrison, 480 U.S. 79, 84 (1987). Warrants must describe (1) the specific offenses for which officers have established probable cause; (2) the place to be searched; (3) and the items to be seized in relation to their designated crimes. See United States v. Ulbricht, 858 F.3d 71, 99 (2d Cir. 2017). Conversely, when a warrant simply permits the seizure and search of property "which would tend to identify criminal conduct" it is not sufficiently particular. United States v. Rosa, 626 F.3d 56, 58, 62 (2d Cir. 2010) ("any and all electronic equipment potentially used in connection with the

18

production or storage of child pornography" provided
meaningless "parameters on an otherwise limitless search").

Second, a warrant is legally invalid for overbreadth to
the extent it permits officers to search or seize items
without probable cause that they contain evidence of a crime.
See e.g., United States v. Hernandez, No. 06 CR. 625 2010 WL
26544, at *7-8 (S.D.N.Y. Jan. 6, 2010). Although legally
distinct, the discussion of these topics often overlap.

The Court must carefully consider the March 7 Electronic
Devices Warrant to assess its particularity and breadth. The
March 7 Electronic Devices Warrant specifically lists each of
the Seized Electronic Devices as the "devices to be searched."
(March 7 Electronic Devices Warrant at 3-4.) It limits the
searching officers to review of the Seized Electronic Devices
only for "evidence, fruits, and instrumentalities of
violations" of Section 1591. (Id. at 4.) It expands on what
that evidence may consist of with a list of eleven categories
such as: "contact information for co-conspirators in the
[Section 1591 conspiracy]"; "opened and unopened voicemail
messages related to [Section 1591 offenses]"; and "digital
photographs and video relating to [Section 1591 offenses]."
(Id. at 4-5.) Finally, it specifies that the searching
officers review digital information only "created, sent,

**SPA20**

received, or obtained between January 1, 2012 and the present." (Id. at 4.)

These search details contained in the March 7 Electronic Devices Warrant sufficiently meet the particularity test laid out in Ulbricht. Courts in this circuit routinely uphold similar warrants against similar particularity challenges when the challenged warrants permit the collection of evidence illustrated by a list related to a set of federal offenses. United States v. Jacobson, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) (upholding validity of warrants which "referenced particular crimes and used illustrative lists as a means of limiting the items to be seized"); United States v. Levy, No. 11 CR. 62, 2013 WL 664712, at *2-3 (S.D.N.Y. Feb. 25, 2013), aff'd, 803 F.3d 120 (2d Cir. 2015) (upholding validity of warrant permitting seizure of "[e]vidence, fruits, and instrumentalities of violations of" the federal wire fraud statute followed by an illustrative list of items, including business records, computers, and "electronic data storage devices").

Kidd's emphasis on the digital quality of the items to be searched does not compel a different result. Each of these earlier cases involved digital materials and found similar warrants valid when faced with similar challenges to their particularity. Moreover, the Second Circuit has recently and

20

repeatedly upheld similar warrants, even when acknowledging the "special problems associated with searches of computers." See, e.g., Ulbricht, 858 F.3d at 101 (upholding the particularity of a warrant which "list[ed] the charged crimes, describe[d] the place to be searched, and designate[d] the information to be seized in connection with the specified offenses" and authorized the search of a laptop).

The Court is further persuaded that the March 7 Electronic Devices Warrant is not overbroad. Kidd challenges the substantive and temporal breadth of the March 7 Electronic Devices Warrant. First, Kidd argues that the search for "contact information for co-conspirators" is overbroad because "the [G]overnment has never contended that there are any co-conspirators." (Motion to Suppress at 16.) Second, Kidd argues that the search period is inappropriate because there is "no allegation by anyone that Mr. Kidd engaged in sex trafficking in 2013, 2014, or 2016." (Id.)

In assessing these challenges to the March 7 Electronic Devices Warrant's breadth, the Court now considers the accompanying Gadner Affidavit.

The Gadner Affidavit supports probable cause for the evidence regarding co-conspirators -- even if they are not included in the Original Indictment -- and during the

designated    search    period.    Regarding    the    conspiracy

allegations,  for  example,  the  Gadner  Affidavit  describes

that, in these sorts of crimes, "[t]raffickers often use their

cellphones  to  communicate  with  .  .  .  customers."  (Gadner

Affidavit at 10.) And at least one earlier affidavit in this

case  had  already  described  that  minor  victims  met  Kidd  at  an

apartment  in  Brooklyn  and  then  engaged  in  sex  acts  with

customers. (See Mitchell Affidavit at 11.) This information

is   sufficient   to   justify   the   possible   existence   of   co-

conspirators, and the Court finds no reason to disturb the

magistrate judge's finding of probable cause.

Next, the Gadner Affidavit lists potential trafficking

crimes that occurred in 2012, 2015, 2017, and 2018 to justify

a search period stemming from 2012 to 2019. The Court defers

to  the  magistrate  judge's  determination  that  there  was

probable cause that Kidd's alleged criminal activities also

encompassed the intervening years, even absent allegations of

illegal  conduct  in  2013,  2014,  or  2016  specifically.  Kidd

points to no similar cases involving a scheme occurring over

multiple years in which a court required the search warrant

application to provide illustrative criminal conduct in each

year the digital device was in use. In fact, courts uphold

search warrants that lack any sort of temporal limitation.

See, e.g., United States v. Triumph Capital Grp., Inc., 211 F.R.D. 31, 58 (D. Conn. 2002).

For all these reasons, the Court denies Kidd's Motion to Suppress any evidence obtained pursuant to the March 7 Electronic Devices Warrant, subject to the Court's determination of whether certain electronic devices were properly seized, a determination that will be made by the Court following the June 21, 2019 evidentiary hearing.

### III. ORDER

For the reasons described above, it is hereby

**ORDERED** that the motion to suppress (Dkt. No. 20) of defendant Lloyd Kidd ("Kidd") is **DENIED** in part. The Court will consider the remainder of Kidd's arguments following the June 21, 2019 evidentiary hearing.


**SO ORDERED.**


Dated:    New York, New York
          18 June 2019

                                    Victor Marrero
                                    U.S.D.J.

23

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/13/202_
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------X
UNITED STATES OF AMERICA,              :
                                       :
                                       :        **18 CR 872(VM)**
         -against-                     :        <u>DECISION AND ORDER</u>
                                       :
LLOYD KIDD,                            :
                                       :
                   Defendant.          :
--------------------------------X

**VICTOR MARRERO, U.S.D.J.:**

On July 15, 2019, defendant Lloyd Kidd ("Kidd") was convicted following a trial of sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(b)(2) and 2 ("Count One"), and inducement of a minor to engage in sexually explicit conduct, in violation of 18 U.S.C. §§ 2251(a), (e), and 2 ("Count Five"). (<u>See</u> Minute Entry dated July 15, 2019.) Kidd is currently awaiting sentence. (<u>See</u> Dkt. No. 109.)

Now pending before the Court is Kidd's motion for a new trial under Federal Rule of Criminal Procedure ("Rule") 33. (<u>See</u> "Motion," Dkt. No. 110.) The Court received the Government's opposition (<u>see</u> "Opposition," Dkt. No. 114) and Kidd's reply (<u>see</u> "Reply," Dkt. No. 115). For the reasons set forth below, the Motion is DENIED.

## I.  BACKGROUND

Count One and Count Five both stemmed from conduct involving Victim-1. In particular, Count One charged Kidd with sex trafficking Victim-1, and Count Five charged Kidd

with taking lewd photos of Victim-1 before she turned eighteen years old. These photos, marked Exhibits 1204-1207[1], were entered into evidence at trial. Kidd's Motion is based on an alleged discrepancy between these photos and another set of photos that were also entered into evidence, marked Exhibits 1213 and 1217.

Exhibits 1213 and 1217 depict a topless girl with a tattoo on her right thigh facing the camera. Victim-1 identified herself as the girl in these photos in her sworn trial testimony. (Trial Tr., Dkt. No. 72, at 134:13-25.) Victim-1 also identified herself as the girl depicted nude, and without a thigh tattoo, in the second set of photos, Exhibits 1204-1207, which formed the basis for Count Five. (Id. at 139:11-16, 143:13-20.) At trial, Kidd testified in his own defense and confirmed that Exhibit 1204, and possibly Exhibit 1207, was a photo he had taken of Victim-1. (Trial Tr., Dkt. No. 76, at 718:5-10, 718:18-719:3.)

After a six-day trial, the jury convicted Kidd on Counts One and Five. At trial, Kidd was represented by counsel appointed under the Criminal Justice Act, but following trial, he requested new counsel to represent him at sentencing and beyond. On July 26, 2019, current defense counsel was

---

[1] The Court notes that Exhibit 1207 is a video rather than a photo exhibit. The distinction is immaterial for purposes of this Motion, and no further reference to its format will be made.

2

appointed, also under the Criminal Justice Act. (<u>See</u> Minute Entry dated July 26, 2019; Dkt. No. 84.)

At a hearing before the Court on October 11, 2019, defense counsel renewed a motion seeking to vacate the judgment under Rule 29 for improper venue. (<u>See</u> Dkt. No. 96.) The Court denied the motion at the hearing, concluding that "there is sufficient evidence on the record from which a reasonable jury could make a legal finding that venue was established." (<u>Id.</u> at 22:8-18.)

Kidd now argues that he is entitled to a new trial under Rule 33 because (1) the Government violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) when it failed to disclose the fact that in the first set of photos, Victim-1 has a thigh tattoo, and in the second set, she does not; and (2) Kidd received ineffective assistance of counsel when his attorney did not notice and make use of this discrepancy at trial. Kidd further argues that the Court should excuse his delay in filing the present Motion because it resulted from the timing of defense counsel's appointment, as well as, in part, the COVID-19 pandemic.

The Government argues that Kidd's delay in bringing this Motion cannot be excused. The delay would prejudice the Government because young and "traumatized" victims testified at the first trial and would be reluctant and possibly

unwilling to testify again. (Opposition at 14.) Moreover, the
two-year length of the delay would make a second trial less
reliable given that memories fade, and defense counsel has
proffered an "inadequate" justification for the delay. (Id.
at 15.) Lastly, the Government points out that defense counsel
could have sought an extension to file post-trial motions
after being assigned to the matter, but did not. Regarding
Kidd's Brady challenge, the Government contends that it
disclosed the photos in question "as soon as they became
available," "highlighted them by marking and introducing them
at trial, and had no affirmative obligation to identify a
'discrepancy'" among them. (Id. at 16.) The ineffective-
assistance-of-counsel claim is meritless, according to the
Government, because trial counsel's defense was vigorous, and
any error did not prejudice Kidd given the "overwhelming"
evidence against him. (Id. at 21.)

In his Reply, Kidd argues that the availability of other
witnesses going forward is irrelevant, and only the
availability of Victim-1 matters. Further, if not resolved at
this stage, Kidd will have to raise his arguments in a
petition under 28 U.S.C. § 2255, thus creating more, rather
than less, delay. Regarding the Brady claim, Kidd argues that
the Government intentionally hid the identity of Victim-1 as
long as possible to prevent the defense from discovering the

discrepancy in the photos. Kidd disputes the Government's position on the ineffective-assistance-of-counsel claim that the evidence was otherwise overwhelming, pointing out that Victim-1's testimony was "substantially undermined in many respects." (Reply at 6.) If the Court is inclined to deny the Motion, Kidd requests an evidentiary hearing at the least "to get to the bottom of the tattoo discrepancy." (<u>Id.</u> at 2.)

## II.   LEGAL STANDARD

Under Rule 33, the Court may, in its discretion, "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). It is the defendant's burden to prove entitlement to a new trial under this Rule. <u>United States v. McCourty</u>, 562 F.3d 458, 475 (2d Cir. 2009). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 2001) (citations omitted). A "manifest injustice" arises when "something has occurred to interfere with the defendant's right to a fair trial." <u>United States v. Yannai</u>, 791 F.3d 226, 242 (2d Cir. 2015). Ultimately, a court's discretion to grant a new trial under Rule 33 "should be exercised sparingly" and only "in the most extraordinary circumstances." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992) (citations omitted).

A Rule 33 motion "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). The Court may excuse a filing delay "if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). In assessing a claim of "excusable neglect," courts consider:

> (1) the risk of prejudice to the government; (2) the length of the delay and the impact on the proceedings; (3) the reason for the delay and whether it was within the defendant's control; and (4) the defendant's good faith or lack thereof in asking for an extension.

United States v. Ketabchi, No. 17 CR 243, 2019 WL 1510444, at *2 (S.D.N.Y. Mar. 25, 2019), appeal dismissed sub nom. United States v. Sinclair, No. 19-1079, 2020 WL 6146339 (2d Cir. June 8, 2020) (citations omitted).

## III.   DISCUSSION

The Court is unpersuaded that Kidd's delay in filing the instant Motion resulted from "excusable neglect." Kidd's guilty verdict was returned on July 15, 2019. Time to file the instant Motion expired on July 29, 2019 -- yet it was filed nearly two years later, on May 19, 2021. The length of this delay is significant. See, e.g., United States v. Jiau, 644 F. App'x 92, 93 (2d Cir. 2016) (affirming the district court's conclusion that the Rule 33 motion filed "eleven months after the verdict" was untimely); United States v.

DiPietro, 278 F. App'x 60, 61 (2d Cir. 2008) (concluding that the district court did not abuse its discretion by finding that a Rule 33 motion "filed nearly ten months after judgment" was untimely); United States v. Urena, No. S305 CR 0760, 2008 WL 2229847, at *2 (S.D.N.Y. May 29, 2008) (concluding that excusable neglect had not been established and finding that the delay of eight months was "substantial").

Likewise, the delay would result in considerable risk of prejudice to the Government were it required to retry this case two years later. "As time goes by, the likelihood of trial witnesses becoming unavailable increases." United States v. Sabir, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007), aff'd in part sub nom. United States v. Farhane, 634 F.3d 127 (2d Cir. 2011). The Court is persuaded that this risk is even greater in this case, considering the youth of the trial witnesses and the sensitive nature of their testimony. The Court further acknowledges that the Government "has a significant interest in the finality of the verdict and in getting [the defendant] sentenced." Id.

Nor has defense counsel provided a justifiable reason for the delay. While the COVID-19 pandemic has undeniably impeded lawyers' ability to perform their duties in a timely manner for reasons outside their control, a full nine months of inaction had elapsed *before* the pandemic could have caused

any delay in filing this Motion. Defense counsel's justification for that period of delay is that his focus after being appointed was "on the Rule 29 motion concerning venue . . . and on sentencing issues." (Motion at 10.) But the Court is unpersuaded that defense counsel's focus -- and his resulting inattention to the issues raised herein -- is a sufficient basis to excuse the lengthy delay. "[M]issed filing deadlines cannot be erased any time a defendant chooses to have new counsel." Ketabchi, 2019 WL 1510444, at *3. Moreover, while defense counsel argues that he did not "see a need to examine" the trial exhibits (Motion at 10), this claim is undermined by his argument on the Rule 29 motion itself, which made repeated reference to certain photo evidence (see, e.g., Dkt. No. 96 at 4:1-10, 7:13-21, 17:24-18:8). And even if the Court excused defense counsel's delay while preparing for argument on the Rule 29 motion, five months remained during which counsel was admittedly "in possession of the Exhibits binder" (Motion at 10), when he could have identified the alleged discrepancy and brought the present Motion.[2] See Endicott Johnson Corp. v. Liberty Mut. Ins. Co., 116 F.3d 53, 57 (2d Cir. 1997) ("In the absence of

---

[2] The Court is likewise unpersuaded that this five-month period could reasonably have been consumed by sentencing preparation. Even if it were, this is not a sufficient basis to find excusable neglect. See United States v. Cates, 716 F.3d 445, 449 (7th Cir. 2013) ("[N]eglect due to a busy schedule is generally not excusable.").

exceptional circumstances, each party is responsible for knowing the pertinent procedural rules and principles and for taking such steps as are needed to protect its own interests.").

The Court makes no finding as to defense counsel's good or bad faith in seeking an extension to file the present Motion. Nevertheless, as set forth above, the remaining factors weigh in the Government's favor. Kidd has thus failed to establish "excusable neglect," and the Court denies this Motion as untimely.

Briefly, the Court notes that, even if an extension were granted, the Motion would fail on its merits. As to the alleged <u>Brady</u> violation, there is no dispute that the Government disclosed all the photos at issue before trial. Kidd argues that it is the discrepancy between those photos that "constituted exculpatory evidence that should have been disclosed and identified by the government." (Motion at 17.) However, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted). And, "as a general rule, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed

evidence." <u>United States v. Ohle</u>, No. S3 08 CR 1109, 2011 WL
651849, at *4 (S.D.N.Y. Feb. 7, 2011), <u>aff'd</u>, 441 F. App'x
798 (2d Cir. 2011) ("Placing a higher burden on the Government
to uncover such evidence would place prosecutors in the
untenable position of having to prepare both sides of the
case at once."). Here, Kidd argues that the discrepancy
between the photos was "very obvious." (Motion at 24.) Thus,
trial counsel "should have known" about it. <u>LeRoy</u>, 687 F.2d
at 618. Under these circumstances, the Government did not
violate its <u>Brady</u> obligations by not pointing out the
discrepancy between the photos to which defense counsel had
access.

　　To the extent Kidd argues that the Government violated
<u>Brady</u> by delaying disclosure of the photos and Victim-1's
identity, the argument is unavailing. Before trial, and
despite the Government's representations that it was "still
waiting for the electronic content from certain seized
devices," trial counsel insisted on proceeding to trial
"immediately." (Dkt. No. 27 at 2:23-24, 8:1-10.) The short
time period between the disclosures and trial was therefore
not a delay tactic on the Government's part, but rather a
strategic decision on the part of trial counsel to avoid the
unearthing of more incriminating evidence. (<u>Id.</u> at 9:13-15
("I would rather move forward to trial with the witness

testimony and not risk that there is some corroboration.");

see also Dkt. No. 66 at 16:9-10 ("The client still wants to

press on to trial despite us not having looked at that.");

id. at 16:10-12 ("Given all of the circumstances, I made a

reasoned and professional judgment that's a reasonable

strategy to do that.").) Moreover, the Government was not

required to disclose the photos or the identity of the victims

immediately upon request. Rather, "as long as a defendant

possesses Brady evidence in time for its effective use, the

government has not deprived the defendant of due process of

law simply because it did not produce the evidence sooner."

United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001).

Kidd -- who carries the burden on this Motion -- has not

established that the short time he had to review the discovery

at issue undermined its effective use, or that speedier

disclosure would have changed the outcome of his trial. Id.

("There is no Brady violation unless there is a reasonable

probability that earlier disclosure of the evidence would

have produced a different result at trial.").

The Court is likewise unpersuaded by Kidd's ineffective-

assistance-of-counsel claim. To prevail on such a claim, a

movant must establish "that counsel's representation was

unreasonable" and "that, but for counsel's incompetence,

there is a reasonable probability that 'the result of the

proceeding would have been different.'" <u>United States v.</u>
<u>Accolla</u>, 253 F. App'x 154, 154–55 (2d Cir. 2007) (quoting
<u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984)).

Here, Kidd has not established that "that the deficient
performance prejudiced the defense." <u>United States v.</u>
<u>Poitevien</u>, 269 F. App'x 15, 16 (2d Cir. 2008) (quoting
<u>Strickland</u>, 466 U.S. at 668). Both Kidd and Victim-1 testified
that Victim-1 was the girl depicted in the second set of
photos. Additionally, other trial testimony established that
Kidd had previously proposed concealing victim identities
with fake tattoos. (<u>See</u> Trial Tr., Dkt. No. 74, at 543:3-6
("Q: What, if anything, did [the defendant] say about
concealing your identity in those photographs? A: He could
blur your face up. If you don't have anything, tattoo or
something, he could create one.")) In light of this testimony,
the Court does not find a reasonable probability that "the
result of the proceeding would have been different" had trial
counsel identified the alleged discrepancy and made use of it
to attack Victim-1's credibility or undermine the
Government's case. <u>See</u> <u>Strickland</u>, 466 U.S. at 688, 694. As
defense counsel acknowledges, the appearance of a tattoo in
one set of photos and not another does not categorically
establish that the photos were not of the same person. (<u>See</u>
Motion at 17.) And even if the jury had discounted Victim-

1's testimony because of the discrepancy, Kidd himself identified the person depicted in the second set of photos as Victim-1, providing an independent basis upon which the jury could have concluded that the person in the photos was Victim-1. Thus, Kidd fails to establish an ineffective-assistance-of-counsel claim.

For substantially the same reasons, Kidd's request for an evidentiary hearing is denied. The Motion is untimely, and fails on the merits. No further evidence is required. See Johnson v. United States, 119 F. App'x 319, 321 (2d Cir. 2005) ("[C]ourts have discretion to determine whether to grant a full evidentiary hearing."); United States v. Ghavami, 23 F. Supp. 3d 148, 157 (S.D.N.Y. 2014), aff'd sub nom. United States v. Heinz, 607 F. App'x 53 (2d Cir. 2015) ("Whether to hold an evidentiary hearing before deciding a motion for a new trial rests within the district court's discretion." (citation omitted).

## IV.  ORDER

Accordingly, for the reasons stated above, it is hereby

**ORDERED**, that defendant Lloyd Kidd's motion for a new trial (Dkt. No. 110) is DENIED.

**SO ORDERED.**

Dated:    New York, New York
          13 July 2021

_____
Victor Marrero
U.S.D.J.

13

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #:_____                   │
│ DATE FILED: 1/31/2022                    │
└─────────────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT

Southern District of New York

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) |
| LLOYD KIDD | ) |

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  18-CR-0872

USM Number:  06406-054

Florian Miedel
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   I and II
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1591(a), (b)(2 | Sex Trafficking of a Minor | 12/12/2018 | I |
| 18 USC § 2251(a), (e) | Inducement of a Minor to Engage in Sexually Explicit Conduct | 12/12/2018 | V |

   The defendant is sentenced as provided in pages 2 through _____6_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   II, III, and IV

☑ Count(s)   all remaining   ☐ is   ☑ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/28/2022
_____
Date of Imposition of Judgment

_____
Signature of Judge

Victor Marrero
U.S.D.J.

Hon. Victor Marrero
_____
Name and Title of Judge

1/28/2022
_____
Date

# SPA38

AO 245B  (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    6

DEFENDANT:   LLOYD KIDD
CASE NUMBER:   18-CR-0872

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
256 months per Count I and II, but to be served concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:
 While his appeal is pending, Defendant should remain at Metropolitan Detention Center in Brooklyn, New York.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at _____  ☐ a.m.  ☐ p.m.   on  _____  .

   ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before 2 p.m. on  _____  .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____  , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:   LLOYD KIDD
CASE NUMBER:   18-CR-0872

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

5 years per Count I and II, but to be served concurrently.

# MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
      ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☑ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 6 |

DEFENDANT:  LLOYD KIDD
CASE NUMBER:  18-CR-0872

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

# SPA41

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page  5  of  6

DEFENDANT: LLOYD KIDD
CASE NUMBER: 18-CR-0872

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

　☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

　☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SPA42**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page <u>6</u> of <u>6</u>

DEFENDANT:  LLOYD KIDD
CASE NUMBER:  18-CR-0872

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   ☑   Lump sum payment of $  <u>200.00</u>  due immediately, balance due

     ☐   not later than  _____ , or
     ☐   in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐ C,    ☐ D, or   ☐ F below); or

**C**   ☐   Payment in equal  _____ *(e.g., weekly, monthly, quarterly)* installments of $  _____ over a period of
     _____ *(e.g., months or years)*, to commence  _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐   Payment in equal  _____ *(e.g., weekly, monthly, quarterly)* installments of $  _____ over a period of
     _____ *(e.g., months or years)*, to commence  _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within  _____ *(e.g., 30 or 60 days)* after release from
     imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate
Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     Case Number
     Defendant and Co-Defendant Names                      Joint and Several         Corresponding Payee,
     *(including defendant number)*        Total Amount             Amount           if appropriate

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.