# 22-287-CR

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

LLOYD KIDD, AKA SEALED DEFENDANT 1,
AKA CHRIS KIDD, AKA GERARD AGARD, AKA RED,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Southern District of New York*

### *PRO SE* SUPPLEMENTAL BRIEF
### FOR DEFENDANT-APPELLANT

To Whom It May Concern,

Thank you for taking the time to acknowledge my appeal. I'm sure you have a lot to go over which takes up time and energy, but I ask that you please consider my arguments carefully before making a decision. I also ask that you please keep an open mind and heart and make your decision based on law, logic, and ethics. I'm aware that the nature of my charges causes people to be biased and unwilling to listen to reason. While an inmate at MCC New York, I nearly lost my life on January 17, 2019 because of this way of thinking. I was also wrongfully convicted on July 15, 2019 because of this way of thinking. Throughout my case there was a lot of foul play involved stemming from before my arrest to even after my trial. I'm sane enough to understand the difference between being paranoid and genuinely conspired against. Even though I'm not guilty of the charges against me, I should have made better choices in how I lived and watched who I kept as company. I am truly ashamed of these allegations because my name has been slandered and I've lost everything. I beg of you to please be fair in making your decision because I don't want to be another statistic, lost in the system.

Sincerely,

Lloyd Kidd

TABLE OF CONTENTS

Illegal Search and Seizure ............................................................... 1
   Warrant Applications and Arrest ................................................ 1
   Evidence Suppression Hearing ................................................... 5
   Case Law ................................................................................ 9
   Attached Exhibits ................................................................. 12
Prosecutorial Misconduct ............................................................ 13
   Evidence Tampering ............................................................. 13
   Representations to the Jury ................................................... 16
   Issues Regarding 3500 Material ............................................. 17
   Contradicting Grand Jury Minutes ......................................... 25
   Kaira Brown's Trial Testimony .............................................. 30
   Case Law .............................................................................. 32
   Attached Exhibits ................................................................. 33
Biased Judge .............................................................................. 35
   Suppression Hearing, Trial, and Rule 29 Motion ..................... 35
   Rule 33 Motion .................................................................... 39
   Sentencing ........................................................................... 45
   Case Law .............................................................................. 47
   Attached Exhibits ................................................................. 50
Improper Venue .......................................................................... 51
   Case Law .............................................................................. 52
Ineffective Assistance of Counsel .................................................. 57
   Case Law .............................................................................. 58
Conclusion .................................................................................. 60

<u>Illegal Search and Seizure</u>

**Warrant Applications and Arrest**

Throughout my case there were a lot of blatant lies and contradictions in the warrants and law enforcement testimony that were more than harmless errors. Some of these issues were raised in my pretrial motions and some of them weren't even though they should have been. If the court had ruled in my favor at the evidence suppression hearing or granted me a *Franks* hearing, the outcome of my case would have been different.

**Agent Affidavit in Support of Application for Warrant and Order for Cell Phone Location and Pen Register Information, Special Agent Brian S. Mitchell**, pages 4 and 5 (December 4, 2018). "In or about May 2017, V-1 accessed an advertisement posted on backpage.com, a website that formally was used to post commercial sex advertisements. V-1 then called the number on the advertisement and spoke to an individual named 'Red,' who provided V-1 with an address to an apartment. V-1 and several other minor victims thereafter went to the apartment and engaged in prostitution. Red kept a portion of the proceeds from these commercial sex activities. In or about the summer of 2017, V-1 went with V-2 and several additional minor victims to an apartment where 'Chris' resided. 'Chris' took photographs of V-2, which he used in advertisements that he posted online. V-2 then engaged in commercial sex acts with at least one client. From in

or about May 2017 up to and including August 2018, an individual listed Target

Cellphone-1 (718–600–7216) in connection with multiple advertisements

recruiting women to work on the individual's behalf. Among other things, the

advertisements requested that only females respond to the advertisement, and that

anyone who is a 'pimp' or 'already working for someone' should not contact the

listed phone number. In or about October 2018, the Target Subject listed Target

Cellphone-1 (718–600–7216) as his phone number ~~and~~ ^M connection with an

application for food stamps."

Target Cellphone-1 (718-600-7216) was my personal cell phone number and

wasn't listed on any of the "recruitment" ads. The government could not provide

any ads showing otherwise because they did not exist. Special Agent Mitchell lied

under oath on the affidavit in order to get my location to arrest me. Not only did he

lie about what phone number appeared on the ads, he was also purposely

misleading by leaving out the fact that every "recruitment" ad said that any females

that responded "must be 18 or older," which would have contradicted the

government's argument that I was preying on minors. I had moved into 9529

Church Avenue in October 2018, two months before my arrest. Prior to that, I lived

at 2458 Nostrand Avenue, where I had moved on April 1, 2016. The government

claimed that they did not get my location to arrest me from that particular warrant,

yet they were unable or unwilling to provide how they got my location. It's

2

impossible that any of my alleged victims from my original indictment gave them the 9529 Church Avenue address, because they had never been there or claimed to be. For counts one and two, all of my alleged crimes took place at 2458 Nostrand Avenue, which is on the other side of Brooklyn. This means that the warrant from my location was obtained under false pretenses and any evidence that was recovered as a result is fruit from the poisonous tree, since the search and seizure of my electronics is what got me convicted. Law enforcement didn't have a search and seizure warrant when they came to arrest me. Had I been arrested anywhere other than my apartment, law enforcement would have never discovered any of my electronic devices to use as evidence against me. Also, Kaira Brown was V-1 and was 18 in May 2017, which is consistent with my testimony and inconsistent with the government claiming that we met in 2015 when she was 16.

**Application for Search and Seizure Warrant, Special Agent Brian S. Mitchell**, page 5 (December 12, 2018): "During a protective sweep of the Church Avenue apartment, law enforcement agents encountered at least three adult victims (respectively, V-3, V-4, and V-5), who stated in ~~some in~~ substance that they had worked as prostitutes for the target subject. V-3 and V-4 both stated that the target subject had informed them that they were not permitted to stop working for him, and that he had threatened retaliation if they attempted to leave or report him. V-3 and V-4 also stated that the target subject keeps information about certain girls

3

who work for him in Safe-1, and that the target subject had kept the proceeds of his prostitution business, in the form of U.S. currency, in Safe-2."

**Application for Search and Seizure Warrant, Special Agent Brian G. Gander**, page 8 (March 7, 2019): "During a protective sweep of the Kidd Premises, law enforcement encountered at least three adult females who were living in the Kidd Premises. One of the females (V-4) stated in sum and substance that all three females had worked as prostitutes for Kidd. V-4 stated that Kidd had informed her that she was not permitted to stop working for him, and that he had threatened retaliation if she attempted to leave or to report him. V-4 also indicated that Kidd kept information about certain females who worked with him in two safes, which among other information prompted law enforcement to seek a search warrant to search the safes. V-4 also described that one of the females, who identified herself as Kidd's wife, had worked as a prostitute for Kidd in the past. This female appeared in several episodes of Chris Kidd's World."

Initially, in the December 12, 2018 search and seizure warrant, Agent Mitchell stated that when the police came to my apartment to arrest me, they encountered three adult victims who all said they worked for me as prostitutes. He then stated that two of these alleged victims said that I threatened retaliation if they stopped working for me and that I kept personal information on certain females in my safes along with money, which he claimed was enough probable cause to

4

obtain a search and seizure warrant. In the March 7, 2019 application for a search

and seizure warrant, Agent Gander's statement was similar except that instead of

all three alleged victims saying that they worked for me as prostitutes, it was only

one. It was also only one female that said I threatened her with retaliation if she

stopped working as a prostitute and one that mentioned the safes in my room. This

is important because it shows a huge difference in both affidavits. These affidavits

are in reference to the same alleged incident which could not have happened both

ways. Either one alleged victim made these statements, or more than one. It's more

than likely that the reason those two warrants contradict each other is because

neither was true. Another possibility is that law enforcement either bribed,

threatened, or coerced those women into telling them what they wanted to hear.

The issue of whether everything was done by the book on the day of my arrest

could have easily been resolved if law enforcement had provided the footage from

my living room camera which would have recorded the whole incident, but they

never did. At my evidence suppression hearing, law enforcement also did not have

an explanation as to how that same living room camera ended up on its side behind

my computer.

**Evidence Suppression Hearing**

On December 12, 2018, the day of my arrest, law enforcement illegally

searched my apartment and the photos that were taken prove this, because most of

5

them contradict each other. In government ~~suppression hearing~~ exhibit 8, there's a baby wipe box in plain view, but in exhibit 16, it's not there, and one of my safes is visible. Also barely visible in the corner is one of my computers. These pictures show that neither the safe nor the computer was in plain view as law enforcement claimed. Exhibit 6 clearly shows the computer in the corner of the closet.

In exhibits 5 and 12, there is what appears to be an iPhone or iPod on my dresser. The screen is on and the device is unlocked. Anyone that is familiar with cell phones knows that when a cell phone has been on a charger for a while, the screen light turns off. It's only after it first gets plugged in that the light would be on, which means that law enforcement had just plugged that device in and then took a picture of it. In exhibit 14, you'll notice it's a photo of the same area on the dresser but without the electronic device, although a condom is present which I didn't put there. Nor did I place the women's lingerie on my dresser that is present in exhibit 12.

In exhibits 3 and 9, my computer is turned off, but in exhibit 17, it's turned on, which shows that law enforcement was tampering with property in my apartment prior to getting a search warrant. In exhibit 3, you can see my living room camera was placed on its back behind my computer so it could no longer record the activity taking place during the search.

In exhibit 21 a drawer full of condoms is open but that same drawer is closed in exhibit 22.

At the evidence suppression hearing on June 21, 2019, Special Agent Judah Burk says she took pictures to preserve the way the apartment looked (hearing transcript page 11), but the photos are inconsistent because so much of my property was tampered with, which the pictures prove.

Pages 60 and 61 of the suppression hearing transcript show that Dana McLeod had incentive to lie about how my arrest took place since she was in the country illegally and her lawyer thought she was in trouble. On page 62, Dana admitted that I didn't like clutter and I always kept my things in place but then when she realized that statement worked in my favor, she changed it so that it worked in the government's favor. On page 64, Dana's version of my arrest totally contradicted Agent Burk's. On pages 69–71, Dana admitted that my living room camera wasn't on its side, but when Mr. Zachary Margulis-Ohnuma tried to go more in depth, Judge Marrero did not allow him to. Pages 83 and 84 show that both Agent Steve Cirillo and Lieutenant Picarello cleared my bedroom of contraband or evidence, so it wasn't necessary for any other law enforcement to go in after them. On page 88, Agent Aaron Spivack admitted that law enforcement were not permitted to execute any searches other than plain view.

One of the most important discrepancies of that hearing was Agent Burk and Agent Spivack's conflicting testimony. On page 24, Agent Burk says she was behind Agent Spivack and he was involved in the protective sweep, but on pages 89–90, Agent Spivack says he was last in the stack because he was the team leader and that he did not participate in the protective sweep. Both agents can't be telling the truth especially since the evidence recovery log has both of their signatures next to several items ~~and~~ in the Recovered By/Observed By section. (See Evidence Recovery Log.) So, this means either somebody forged Agent Spivack's signature, or he simply signed his name without observing or recovering the items, which he couldn't have done if he wasn't involved in the protective sweep, which Mr. Margulis-Ohnuma pointed out on pages 103-104.

Judge Marrero's focus was on what I stated in my affidavit about my practices with keeping my iPhone in my safe, hearing transcript page 101. I wanted to take the stand and explain, but Mr. Margulis-Ohnuma literally threatened to quit as my attorney if I did so, so I didn't, which I regretted and pointed out at trial when I asked the court for permission to represent myself with Mr. Margulis as standby counsel (trial transcript pages 189-199).

The reason I kept my iPhone in my safe was because it cost me $1,300 and I didn't want to take the chance of someone stealing it, so every night, before I went to bed, I put my phone and wallet in my safe. I had a lot of Apple products and

8

some of them looked similar and were connected to the same iCloud account. I had

two black iPods that looked exactly like my iPhone including the apps that were

downloaded on them, since they were linked. I didn't keep my iPods in my safe so

it's possible that what law enforcement claimed was my iPhone in plain sight on

my dresser was really an iPod that they took from my drawer and plugged in to get

probable cause. Either that, or they illegally opened my safes and then got a

warrant afterwards. If you look at the evidence recovery log and the evidence

collected item log, you'll see that there are serial numbers listed next to pretty

much every device except for the three that look just alike which are the two black

iPods and the iPhone.

**Case Law**

*United States v. Jesus A. Castro*/2nd Circuit/#90-1665

A friend of Jesus A. Castro's invited him for the evening at the apartment of

the tenant. The friend did not show up, and Jesus went to sleep sharing a bedroom

with the tenant. An illegal search and seizure occurred that night, wherein officers

seized cocaine, money, and other items. After the district court denied his motion

to suppress the physical evidence, Jesus pleaded guilty conditionally, pursuant to

Fed. R. Crim. P. 11(a)(2), to conspiring to distribute and possess cocaine, and

appealed. Reversing the denial of the suppression motion, this Court ruled that

Jesus was an overnight guest and, as an overnight guest, his Fourth Amendment

rights were violated by the search. The Court determined that the only reasonable

conclusion was that Jesus became an overnight guest of the tenant when his friend,

who had initially extended the invitation, failed to show up. The tenant's

permission for Jesus to stay in the apartment for the night was all that was required

for Jesus to qualify as an overnight guest. The Court explained that Jesus had a

legitimate expectation of privacy in the apartment. As a result, the Court vacated

the judgment of conviction and remanded the case. The court explained that

Jesus's Fourth Amendment rights were violated by an illegal search and seizure,

because he had a reasonable expectation of privacy as an overnight guest, which he

became when the tenant permitted him to sleep in his apartment.

*United States v. Ruben Perea*/2nd Circuit/#92-1188

Ruben Perea argued that the district court should have granted his motion to

suppress certain statements and evidence as the fruits of an illegal search and arrest

that led to his conviction for conspiracy to distribute cocaine and marijuana. This

Court found that Ruben was a bailee of a duffel bag containing cocaine and

marijuana because there was no question that he had custody of it when agents

stopped the cab. Ruben conducted himself and dealt with the property in such a

way as to indicate a subjective expectation that his property would be preserved

because of his repeated glancing about for surveillance. Therefore, the Court

vacated the conviction because Ruben as a bailee had at the time the cab was

10

stopped a protectable expectation of privacy in the duffel bag, and the district court

did not make findings as to any of the factual matters needed to resolve the

lawfulness of defendant's arrest or of the search of the duffel bag. The Court

remanded for determination if Ruben abandoned the bag or consented to its search,

or if the search was permissible by reason of an exception to the Fourth

Amendment's warrant requirement.

### *Jerome Franks v. State of Delaware*/United States Supreme Court/#77-5176

Prior to trial on rape and related charges in the Superior Court of Delaware,

Jerome Franks sought to suppress clothing and a knife found during a search of his

apartment that had been conducted pursuant to a warrant which was obtained on

the affidavit of the police. Although the motion to suppress had originally alleged

that the warrant on his face did not show probable cause and that the search and

seizure were violative of the Fourth and Fourteenth Amendments, it was amended

at a hearing on the motion to include an attack on the veracity of the warrant

affidavit, and the request was made to call certain witnesses to establish the alleged

untruthful matters. The trial court sustained the state's objection to the defendant's

going behind the warrant affidavit and denied the motion to suppress. After Franks

was convicted at a trial at which evidence obtained during the challenged search

was admitted, he appealed, and the Supreme Court of Delaware affirmed, holding

that a defendant under no circumstances could challenge, subsequent to the *ex*

11

*parte* issuance of a search warrant, the veracity of a sworn statement used by police

to procure the search warrant. On *certiorari*, the United States Supreme Court

reversed and remanded. The justices found that (1) where a defendant made a

substantial preliminary showing that a false statement knowingly and intentionally,

or with reckless disregard for the truth, was included by an affiant in his affidavit

for a search warrant, and if the alleged false statement was necessary to the finding

of probable cause, the Fourth Amendment required that a hearing be held at the

defendant's request so that he might challenge the truthfulness of factual

statements made in the affidavit, and (2) if at such a hearing the defendant

established by a preponderance of the evidence the allegation of perjury or reckless

disregard, and, with the advance false material set to one side, the affidavit's

remaining content was insufficient to establish probable cause, the search warrant

had to be voided and the fruits of the search excluded to the same extent as if

probable cause was lacking on the face of the affidavit.

**Attached Exhibits**

- Suppression Hearing government exhibits 1-3, 5, 6, 8, 12, 14, 16, 17, 21, 22

Prosecutorial Misconduct

**Evidence Tampering**

Exhibit 413 was in relation to Dana McLeod's count. On the original Exhibit

413, it said this ad was posted on July 24, 2017. Dana wasn't in the country at this

time because she went back to Guyana in mid-April 2017 for six ~~weeks~~ months, due to her

being in the United States on a six-month visa. She didn't return until September

11, 2017. When my attorney, Mr. Zachary Margulis-Ohnuma, cross examined

Dana at trial, I asked him to get her to confirm on the record when she entered and

exited the country. Dana then read the dates that were officially stamped on her

passport (trial transcript page 509–512). It was at this point the government

realized their error and changed the date of Exhibit 413 before I could point it out

to the jury. When I took the stand, I went through the Backpage ads in evidence

looking for this particular ad so I could point it out to the jury and show them that

none of the dates provided by the government were reliable (trial transcript page

666–672). I couldn't find the ad because none of them were dated July 24, 2017

any longer. I didn't think to remember Exhibit 413 specifically during Dana

McLeod's testimony because I didn't think the government would tamper with

evidence in the middle of trial, so when it was shown to me I didn't recognize it

because the change had already been made (trial transcript page 680–681). It

wasn't until after I got off the stand and had Mr. Margulis go through the ads

13

entered as evidence on his laptop that I saw where the change was made. After Dana's testimony, the government changed the posting date of Exhibit 413 from 7/24/17, when Dana was out of the country, to 10/22/17, when she was back in the country. I pointed this out to Mr. Margulis and asked that he request that I be allowed back on the stand to show the jury but he said no. Mr. Margulis was supposed to point this out to the jury in his closing argument by putting both versions of Exhibit 413 side-by-side and letting them know that it was changed after Dana's testimony, but he didn't do this. Once I saw he wasn't going to bring this issue up I attempted to do it myself by mentioning the misconduct, at which point I was scolded by Judge Marrero (trial transcript page 842–843). Even though I was acquitted of Dana McLeod's count, this is extremely important for several reasons. First, it proves that the government did everything in their power to convict me. Second, it destroys the credibility of the dates of any evidence that the government presented to the jury, which is important because dates and timestamps are the only reason I was convicted of any counts. Last, had the jury been made aware of this during trial, there's no way they would have convicted me of any of the counts because they would have had solid proof that the government was using false evidence to get a conviction. This would have raised the jury's concerns of what other evidence the government might have tampered with, and if they tampered with witnesses' testimony as well. Under no circumstance is

14

prosecutorial misconduct justifiable and this was way more than a "harmless error." (Versions of Exhibit 413 attached.)

While on the stand, I pointed out to the jury the inconsistency of Exhibit 400, which was an ad related to Kaira Brown (page 714–715). This is an ad that the government claimed had child pornography in it. Several of the alleged pictures of Kaira Brown had a phone number across them but one didn't. This was extremely inconsistent with every other ad presented as evidence. The only plausible explanation for the ad in question is that the government looked for pictures to pass as Kaira Brown before her 18th birthday and copy and pasted the same phone number on all of them but forgot to paste it on that one. None of the text in any of the ads was ever in dispute, but the pictures were, which I pointed out (trial transcript pages 714, 715, 724, 741). Without my electronic devices that were seized from an illegal search, the government would not have had access to any of these pictures to be able to put with the text. Aside from "recruitment ads," the government didn't have any ads or pictures related to any of my alleged victims when I was indicted and arrested. This makes their evidence even less reliable because they were only able to create and reconstruct most of those ads with pictures they found on my computer, not pictures that were actually posted online on Backpage.com. Backpage only allowed someone posting to upload a maximum of 12 pictures on an ad. Several ads that were presented as evidence by

the government had triple that amount, which would be impossible to put on any actual Backpage ad.

**Representations to the Jury**

The government continuously presented Count 5 as production of child pornography to the jury throughout the trial, which was extremely prejudicial. The actual charge was inducement of a minor, which makes a huge difference. This was done to make the jurors biased against me by playing on their parental instinct. It's common knowledge that society frowns down on people accused of sex crimes. But people accused of sex crimes involving children are more prone to biased judgments which lowered the chances of me receiving a fair trial on that count and any other related counts. Counts 1 and 2 were presented to the jury as sex trafficking of a minor, not a child. So why not continue using the term "minor" for Count 5, when it was in relation to the same alleged victim of Count 1? A child is a young person between the periods of infancy and youth. The government claimed that the media in question was of Kaira Brown a month before her 18th birthday. The legal age of consent to have sex in the state of New York is 17 years old. So, if 17 years and 11 months old is a child, then that implies that sex with children is legal in New York. My point is that child and minor aren't the same thing. The legal drinking age is 21. If a store owner got busted for selling alcohol to a 20-year-old, would they be accused of selling alcohol to a child or a minor? To

be considered a minor means a person has not obtained the legal age of consent for something. The legal age to consent to prostitution is 18. Hypothetically, if that was Kaira Brown in the video and pictures at 17 years and 11 months old, how can she be called a child when she was legally allowed to have sex at that age? That means an adult can legally have sex with a 17-year-old but if they record themselves doing it they produce child pornography? That implies that that one-month difference is a transition from childhood to adulthood, which is a very serious implication, especially since people younger than 17 get charged as adults for crimes all the time. Had Count 5 been presented to the jury properly, there's a good chance I would have been acquitted of that count along with Count 1 since they were related.

**Issues Regarding 3500 Material**

My right to having my 3500 material, which included my grand jury minutes, was violated under the Fourteenth Amendment. Not only was I not allowed to have any of my 3500 material to keep in my possession but I was not made aware of a lot of it until after I was convicted at trial. The government's justification was that it contained sensitive information including phone numbers, addresses, etc. Because of this there was a protective order placed on it instead of simply giving me a redacted version. The reason I went to trial was to prove my innocence and find out who my accusers were, but if I wasn't allowed to have my

17

3500 material, how was I supposed to properly defend myself against their allegations? I briefly went on record about this during trial while asking the court to allow me to represent myself with Mr. Margulis as standby counsel (trial transcript page 195). Once the protective order was finally lifted, I learned that there were text messages between Kaira Brown and Detective Rosemary Muckenthaler which showed that Kaira was worried about being arrested initially and then later on started requesting money and other favors in exchange for her testimony. There was also a written statement from an in-person interview on June 6, 2019, in which Kaira Brown admitted to sex trafficking a 12-year-old girl named Tiffany and jumping out of a window to escape when law enforcement arrived. By the time I got this information trial was over. There's a good chance that if the jury was made aware of these things, they would've seen that Kaira Brown had even more incentive to lie on me and falsely identify herself in photos and a video. I also wasn't able to use my grand jury minutes for impeachment purposes.

With regard to Count 5 for Kaira Brown, the government made sure I wasn't able to see the media in question until trial. Me not being allowed to be in possession of alleged child pornography is one thing but my attorneys not being allowed is another. If they were allowed to show it to me during a legal visit and take it back with them I would have at least been able to examine it properly to determine who the person in question was to defend myself at trial. All I had to go

on was Mr. Margulis's very vague description of what the video and pictures showed. The video was more consistent with Dana McLeod and more likely to be her assuming that the timestamp was correct. There was never any dispute about when I met Dana. The dispute was how we met and how she began engaging in prostitution. Dana accused me of recording her when we first met in February 2017 but she alleged that I secretly recorded us having sex which wasn't true and was never proven. However, I have recorded Dana up close before with her consent, so more than likely the video was of her. Mr. Margulis advised me not to mention this to the jury unless I was 100% sure. He also said it wasn't a good idea to mention the video being Dana at all because the jury might feel sorry for her since she's from a third world country and a lot of immigrants get sex trafficked. Whenever the prosecutor played the video for the jury it was only for two seconds. It's an up-close video that shows nothing more than a woman's genitalia and fingers. The pictures also could have been of Dana. During her direct examination, Kaira Brown identified herself by pointing out an unclear tattoo on the left arm of the female in the photo which was so blurry and far away that it could have been a variety of designs. Afterwards, Ms. Bracewell asked Kaira if there were any other identifying marks that she could see in the photographs that she recognized, to which she answered no. Afterwards Ms. Bracewell asked if Kaira recognized any particular skin discolorations or anything like that. Only then, after being led, did

19

Kaira point out little marks in the stomach area that she claimed to still have (page 140–141). Later in her testimony, she started identifying discoloration marks in other photos, which she hadn't done prior to being led by Ms. Bracewell. Dana also has a tattoo on her left inner forearm which is an extremely common area on the body that people get tattoos. Kaira and Dana also have the same skin tone and body build. The media could have been of Dana or a number of other females. Since the media was from 2 ½ years prior, it was hard to identify who it was. All the pictures of Kaira Brown posted by the government that clearly showed her face were time stamped after her 18th birthday, but the alleged child pornography that was time stamped a month before her 18th birthday didn't show her face. Also, the device the government claimed produced this media was never recovered.

The official FBI report entered June 11, 2019 (3507-07) was based on notes of an in-person interview of Kaira Brown on June 6, 2019 (3507-10). Prior to trial the only versions of 3507-07 and 3507-10 I was allowed to see were heavily redacted. When I asked my trial attorney why, he said the redacted parts were pertaining to other people that had nothing to do with me or my case. Over a year after I was convicted at trial, my new attorney Florian Miedel got the protective order on my 3500 material lifted, and I was allowed to have it in my possession. It was then that I saw the unredacted version of 3507-10 and learned that Kaira Brown told the government she sex trafficked a 12-year-old girl named Tiffany.

20

Prior to this I was totally unaware of this and it's possible Mr. Margulis was as

well, because the paragraph detailing the incident was completely blacked out in a

version of these notes that Mr. Miedel sent to me. Since I only had the unredacted

version at this time, it was hard to prove until months later when I was provided

with the original version that I saw before trial. The government purposely blocked

out the incident so I couldn't bring it up at trial which is important because it

shows that Kaira Brown had incentive to lie on me to get herself out of trouble. If

the jury was made aware of this, there's a strong possibility that they would have

fully acquitted me on all counts. In 3507-07 (the official FBI report) when the

same incident is reported it isn't said that Kaira Brown sex trafficked Tiffany, it

simply says that she "knew" her and gives a totally different version of what

happened, so anybody reading it would never know. Throughout 3507-07 there are

a lot of added details that weren't in the original notes of the interview, including

blatant contradictions, added-on theories, and statements that were manipulated to

either make Kaira Brown appear as more of a vulnerable victim or to make others

including myself appear more heinous. This is important as well because it proves

that Kaira Brown was coached leading up to and during trial as well as led on what

to say. The following are examples of the discrepancies between 3507-07 and

3507-10.

21

- #1 6/6/19 She was "working" at another location, she was 15. She was working on Canarsie, he responded to her ad on BP.

- #1 6/11/19 One day, a man named "Red" responded to one of her friends advertisements on backpage.com.

- #2 6/6/19 he met up with them offered to get food and liquor. Both of them were drinking fifth of Hennessy. 1/2 the bottle.

- #2 6/11/19 he provided Brown and her friend a fifth of Hennessy. Brown estimated that she and her friend had drank half the bottle. Brown had never really drank before.

- #3 6/6/19 he told her she had to get naked for him to take photos for realism

- #3 6/11/19 Red instructed Brown to take her clothes off and get naked so that he could photograph her to place the photos on the advertisements he would be posting on Backpage on her behalf. Red told Brown that it would look more realistic if she was naked. Brown complied and let Red take the photos.

- #4 6/6/19 after three or four clients she was tired/in pain wanted a nap. He said she couldn't it was working hours.

- #4 6/11/19 after approximately three or four clients, Brown was tired and in pain. Brown stated that she had lost her virginity only a short

time before meeting Red and she was not used to that amount of sexual activity. She told Red that she wanted to take a nap. Red told her that she was not allowed to sleep because it was working hours.

- #5 6/6/19 when a customer came, she would have to immediately give money for split.

- #5 6/11/19 The client would pay Brown immediately before the date started, and Brown would then give the money to Red. His bedroom door was inside the room where she entertained dates. Sometimes Red would not split the money with Brown or the other girls; he would play it off like he forgot.

- #6 6/6/19 he had a computer in living room – she saw him making ads with emojis with cameras → she told him that she didn't want to be filmed

- #6 6/11/19 Brown told Red that she did not want to be filmed by any clients. (If Kaira Brown made it clear that she did not want to be filmed, then it is even less likely that the alleged child pornography images and video depict her.)

- #7 6/6/19 at one time she counted 13 girls there.

- #7 6/11/19 girls came and went from Red's residence. Some stayed at the location and others ~~were~~ would just come to work for periods of time and

23

would leave. Red was also selling marijuana and cocaine to the girls. At one time Brown counted approximately 13 girls at the residence.

- #8 6/6/19 One day a customer showed up looked at Tiffany and said she looked extremely young. Shortly thereafter the cops showed up. Kaira jumped out the window. Hensley would put her in charge if he wasn't around five girls had been in residence

- #8 6/11/19 One day a customer showed up to that location and looked at Tiffany and stated that she looked young and left. Shortly thereafter, the police showed up at the residence. Hensley was not there at the time and there was narcotics and cell phones lying around the residence. Brown thought that if she was caught, she would be charged with the drugs. Brown gathered up all the electronics and drugs on her person and jumped out of a third- or fourth-story window and ran away. There had been five girls at the location that day.

- #9 6/6/19 35th St. in Brooklyn → get off train near Newkirk, no light, no heat, no water. (Stayed there while ~~waiting~~ _waiting_ for Hensley)

- #9 6/11/19 There was also a location on 35th St. in Brooklyn that was Hensley's. To get there, you would have to get off the train near Newkirk. This location also did not have lights, heat, or water. Brown would have to use containers of water and shower in the backyard.

24

- #10 6/6/19 DD's house on 32nd St., Hensley's aunt house? Kaira worked out of there. Aunt needed money even though she didn't like what was going on. She had annoying dog

- #10 6/11/19 DD's apartment was on 32nd St. Brown believe that DD may have been Hensley's aunt. DD needed money even though she did not like what was going on in the apartment. Brown believe that she had a drug problem. DD had an annoying little dog

- #11 6/6/19 when she turned 17, one of her friends was arrested for prostitution, it shook her up. She didn't want to make work anymore (fall 2016) (her birthday is in spring)

- #11 6/11/19 Brown still worked for Red while she was working for Hensley. However during the fall of 2016 when Brown turned 17, one of Brown's friends was arrested for prostitution and it shook Brown up. She realize that she didn't want to work anymore and wanted to get her life on track.

  o This statement implies that she stopped working in 2016 so how was I charged with incidents from 2017?

**Contradicting Grand Jury Minutes**

12/11/18 grand jury testimony, pages 65-66:

25

Q. For approximately how long did Ms. Brown engage in prostitution for Mr. Kidd?

A. For approximately two months with Mr. Kidd. She left him for a period of a few weeks, came back, and then was on and off with him and another pimp until approximately October of 2018.

Q. And approximately how old was Ms. Brown when she be in working for Mr. Kidd?

A. I believe she was 16 at the time, just turned 16.

6/26/19 grand jury testimony, page 8:

Q. And approximately, how long did Kaira Brown work for Mr. Kidd?

A. Approximately from the time she was 15 years old to just before her 18th birthday.

Q. And was that, approximately, from the spring of 2015 to, approximately, February 2017?

A. Correct.

When the government first indicted me, they painted the picture to the grand jury that I sex trafficked Kaira Brown for three years from when she was a minor until after she was an adult. When they superseded me with Count 5, they changed that theory to me sex trafficking Kaira Brown until before her 18th birthday when she was still a minor. This means that they purposely misled the grand jury to get

26

an indictment, and they didn't have their facts straight before indicting ~~interesting~~ me. The constructively amended indictment proves this. The original indictment charged me with committing Count 1 in 2015 as a one-time incident, but once I was superseded with Count 5, Count 1 was changed to "2015 to February 2017" to coincide with the February 2017 date for Count 5. Counts 1 and 5 were supposedly based on information from Kaira Brown but those timelines were contradicted by Kaira Brown at trial. See Trial Transcript page 116 ("Q. Until approximately when did you work for the defendant? A. Approximately until the end of 2017.").

The grand jury testimony is also contradicted by the government publicly publishing Exhibit 1214, which is time stamped April 2017, when Kaira Brown was 18. This means, if they had this evidence to present to the jury at trial, then they had the same evidence to present to the grand jury but chose not to because [*for count 5*] they wanted the grand jury to believe I only had Kaira Brown work for me as a minor. The variance occurred because even though Count 1 was constructively amended from 2015 to 2015 to February 2017 at trial, the government only proved to the jury that I was in contact with Kaira Brown in 2017, nothing earlier, and Kaira Brown's testimony clearly wasn't credible since the jury acquitted me of force, fraud, or coercion. That's a two-year difference. That and the fact that the jury was given two different jury instructions at trial proves that they were confused. They could have simply believed that I sex trafficked Kaira Brown in

27

February 2017, not for over two years, which also goes toward the "reasonable opportunity to observe" element for Counts 1 and 5. If the jury believed I met Kaira Brown only a month before her 18th birthday, then it's not likely they believed that was a reasonable opportunity to observe that she was a minor, especially since Kaira Brown herself admitted that she was engaging in prostitution before she met me and that I made it clear that she had to be 18 or older in order to work by me (see trial transcript pages 174-176).

During trial, the government publicly published Exhibit 1214 as evidence for the Kaira Brown count (transcript page 135). This was the photo that Kaira Brown identified herself in and said that I took of her. The government made sure not to disclose to the jury that this photo was time stamped as being created in April 2017 when Kaira Brown was 18. They also made sure not to publicly publish any other photos from that particular series or any other series that showed Kaira Brown's thigh tattoo. If their argument was that I sex trafficked Kaira Brown from 2015 to February 2017 for Count 1 and induced her as a minor in February 2017 for Count 5, then why introduce any evidence dated after February 2017 to the jury? It was an inconsistent legal strategy used to mislead and confuse the jury. Since timeline played a big part in the case, why not publicly publish all of the photos Kaira Brown identified herself in and provide the creation date for each one, then allow the jury to compare them and decide if they believed the alleged child pornography

to be Kaira Brown, since I clearly wasn't sure and Kaira Brown wasn't a credible witness. If trying to have someone properly identify them self in a photo, wouldn't it have made more sense to publicly publish a picture of the person in question facing forward? Which the government did for all of the alleged photos of Kaira Brown except for the photos showing her thigh tattoo. The government might argue that their focus was only on photos time stamped before Kaira Brown was 18, but that would be contradicted by the fact that they publicly published Exhibit 1214 which was created after she was 18 but does not show her thigh tattoo. It would also be contradicted by the fact that in relation to Kaira Brown I was charged with force, fraud, or coercion as well, so with regard to that part of the count, her age wouldn't have mattered even though that was also alleged to have happened while she was still a minor. Had the government publicly published Exhibit 1213, which was a picture of Kaira Brown facing the camera with her bare breasts exposed showing her thigh tattoo, the government would have had to explain to the jury why it wasn't being included in Count 5 as child pornography. Since it was a clear picture of Kaira Brown and was timestamped after her 18th birthday ~~so~~ her being semi-nude wasn't a legal issue.

~~To add to my point~~, the government and Kaira Brown claimed that Kaira Brown had a tattoo on her left forearm before she met me. Only adults (people who are 18 and older) are legally allowed to get tattoos. It's natural and reasonable, if

you meet someone with a real tattoo and they appear to be an adult, to assume that they are at least 18 years old. By the same logic, if you meet someone at a bar who is drinking an alcoholic beverage and they appear to be an adult, then it would be natural and reasonable to assume they are at least 21 years old. Even though I met Kaira Brown when she was 18, this goes towards the reasonable opportunity to observe element for Counts 1 and 5.

**Kaira Brown's Trial Testimony**

Kaira Brown's timeline of the alleged events was extremely inconsistent with evidence such as photo timestamps, lease agreements, and her AWOL history from Good Shepherd Services. She claimed to begin working for me as a prostitute in spring and summer of 2015 (Trial Transcript pages 115–116). She also claimed to return to my apartment very frequently ranging from two days to almost 2 weeks (page 121). Her Good Shepherd records show that she was only marked AWOL twice in 2015 and for no longer than three days. The first time she was marked as being AWOL for a long period of time was from February 29, 2016 through June 27, 2016.

Kaira Brown claimed that the Nostrand Avenue apartment is the only place she ever knew me to live in and the only place she engaged in prostitution for me, but an official lease agreement proves that I didn't move into 2458 Nostrand Avenue until April 1, 2016. The government might argue that if Kaira Brown was

30

AWOL for four months, then she could have stayed with someone else up until April 1, 2016, and then come by me. But that argument would be contradicted by several facts. The government initially claimed that Kaira Brown began working for me in spring 2015 and Kaira Brown's testimony confuses the timeline drastically. None of the alleged pictures of Kaira Brown were dated earlier than February 2017, including the alleged child pornography. Kaira Brown identified exhibits 1221 and 1222 as being included in the first posting of her that she claims I put on Backpage.com. She also claimed that this took place the first day she ever went to see me. Trial Transcript pages 177-178. The timestamp on both of these exhibits is February 2017. She claims she provided me with Exhibit 1223–1225 to post of her online. She said that she took the first photo of herself and the second two were taken by someone else (page 137). On cross examination, she confirmed that Exhibit 1225 was taken by someone else before she met me (page 179). The timestamp for Exhibit 1225 is February 13, 2017, which means it's impossible that Kaira Brown is the woman depicted in the alleged child pornography, since that media is dated February 1 and February 2, 2017, and she is on record as being present in Good Shepherd. That testimony also proves that it's impossible that we met in 2015. This means that the government either coached Kaira Brown on what to say, didn't do a thorough investigation before prosecuting me, or knew she was lying and still chose to prosecute me. All three scenarios are legally and morally

31

unethical especially since they led to a wrongful conviction and a sentence of 256 months' imprisonment.

**Case Law**

*United States v. Antonio T. Ballard*/2nd Circuit/#17-427-CR

This Court found that (1) Antonio T. Ballard's convictions under 18 U.S.C. §§ 1591(a)(1) and (2) and 18 U.S.C. § 2422(b) were vacated because he should have been granted a new trial under Fed. R. Crim. P. 33 due to improper prosecutorial summation comment suggesting that incriminating evidence had not been put before the jury, and although the trial court gave a somewhat equivocal instruction to the jury that it was to base its verdict only on admitted evidence, it might nevertheless have appeared to reinforce the government's suggestion that there was still more evidence that the jury had not heard, thus risking minimizing the government's burden of proof and resulting in a conviction violative of due process under the Fourteenth Amendment, and (2) unobjected-to prosecution statements were not so abusive, much less indicative, of plain error, as to have warranted a new trial. As a result, Antonio T. Ballard's conviction was vacated and he was granted a new trial.

*United States v. Ernest Raymond Basurto et al.*/9th Circuit/#72-2781, 72-2612, and 72-2679

Defendants appealed their convictions for conspiracy to import and distribute marijuana, in violation of 21 U.S.C. §§ 176(a), 841, and 952. The court reversed all the convictions, finding that testimony presented to the grand jury was perjurious and that this was learned by the prosecutor who took no action. The court held that the perjury before the grand jury was material because of a change in the law. The court found that all of the untruthful testimony related to activity at a time when the statute had been changed. The court held that the Due Process Clause of the Fifth Amendment was violated because defendants had to stand trial on an indictment which the government knew was based partially on perjurious testimony, that the previous testimony was material, and that jeopardy had not attached. The court ruled that the prosecutor was under a duty to immediately inform the court and opposing counsel to ensure that appropriate action was taken. The court held that an agent's entry into one defendant's home violated the Fourth Amendment, and that the papers found at the kitchen table, and any statements made as a result thereof, should have been suppressed.

**Attached Exhibits**

- Grand jury transcripts from 12/11/18 (pp. 65-68) and from 6/26/19 (pp. 7-14)
- 3 versions of Trial Exhibit 413

- Trial Exhibit 1213; Trial Exhibit 1217; Trial Exhibits 1221-1225 (with metadata)

- Single page from 3507-07 showing redacted passage about "Tiffany"

- 3507-07 and 3507-10

- Pages from 3507-12 and 3507-13 (texts between Kaira Brown and Det. Muckenthaler about Brown's fear of being prosecuted and about Brown's tattoo, respectively)

- Housing Court records

- Lease agreement beginning April 1, 2016, for 2458 Nostrand Avenue

- Kaira Brown's AWOL records from Good Shepherd Services

<u>Biased Judge</u>

**Suppression Hearing, Trial, and Rule 29 Motion**

Right before trial, Ariel Palopolo went to the government and said a private investigator called her and said I was right next to him and wanted to speak to her. The PI in question was hired by Mr. Margulis and I had never had any form of communication with him. The Government brought this unfounded accusation to Judge Marrero's attention, unaware the PI recorded the conversation between himself and Ariel. Once the recording was played and it was proven that Ariel blatantly lied on me, the government tried using Ariel's alleged anxiety disorder as an excuse. After this episode, she was still allowed on the witness stand even though she clearly wasn't stable, credible, or reliable. The court also ruled that the defense wasn't allowed to bring this incident up for the jury to hear. Also even though Ariel Palopolo clearly didn't describe sex trafficking in her testimony, Judge Marrero didn't even ~~dismiss~~ dismiss her count in response to Mr. Margulis's application pursuant to Rule 29 (page 608).

The government wanted to supersede me a second time for inducement of a minor as Count 5 in relation to Kaira Brown. However they couldn't unless Judge Marrero ruled in their favor at the evidence suppression hearing scheduled for June 21, 2019, since the media in question was found from electronic devices recovered during an illegal search of my apartment. I requested that Dana McLeod and Ariel

Palopolo be subpoenaed to testify to the events that took place on December 12, 2018, since they were both present at the time of my arrest. According to an email I received on June 11, 2019, from Ms. Victoria Medley, the suppression hearing was supposed to be changed to a status conference hearing instead since the government was unable to contact one of their witnesses (Ariel Palopolo) to testify. She told me not to worry because nothing was going to happen. When I arrived at court, Judge Marrero turned it back into a suppression hearing without notifying anyone. No one from the defense came prepared for anything more than a status conference and Ariel never appeared. The hearing should have been postponed until a time when all the witnesses were available. Judge Marrero ruled in the government's favor at the hearing and as a result I was superseded a few days later with Count 5. Also, Ariel was never punished for ignoring the subpoena but was present during my trial to testify against me. This is an issue because it means one of two things: Either Ms. Medley lied to me about the status conference, or Judge Marrero lied to her and Mr. Margulis.

Throughout my case, there has been major issue with inaccuracy of the stenographer's transcripts of the court proceedings. They have been extremely inconsistent with what was actually said in the court room, which makes them unreliable. Major parts of my court proceedings have been left out or typed up to make me appear uneducated and less articulate. They have also been edited in a

36

way that favors the government. During trial when I took the stand, there was a part in my testimony on cross examination where I accused the government of framing me, and Ms. Tarlow mocked me in front of the jury. When I read over the transcript trying to find it, I couldn't. Ms. Tarlow mentioned this on page 10 of my sentencing transcript.

Also, on October 11, 2019, at my Rule 29 hearing on venue, AUSA Jacob Gutwillig fumbled for an argument as to why my charges shouldn't be vacated at which point Judge Marrero spoon-fed him what to say. I pointed this out to my attorney Florian Miedel immediately and he agreed that this was improper. Because of this I asked for the transcript of this particular hearing to have proof that Judge Marrero was biased against me, but once again the transcript was inaccurate. It shows Judge Marrero's argument as Mr. Gutwillig's and doesn't show the hesitation in Mr. Gutwillig's response to Mr. Miedel. I've asked for the audio recordings of these proceedings but was told they don't exist.

During trial, the government presented Exhibit 605 which was phone account information as evidence to me for the first time when I took the stand. Prior to that, I had no knowledge of this evidence. When Mr. Margulis went on record about this asking for a recess so I could review it, Judge Marrero sided with the government's objection (page 717). This is important because the ZTE Android phone in question is the phone the government claimed produce the alleged child

37

pornography. I also pointed out that the phone account said it was under T-Mobile who hadn't been my cell phone service provider since 2011 or 2012.

Judge Marrero never explained to the jury that time frame was an element that could get me acquitted of the counts if it was improper. The original indictment accused me of sex trafficking Kaira Brown in the spring of 2015 as a one-time incident. The superseding indictment changed the date to spring of 2015 to February 2017 once Count 5 was added, which is a big difference. So if the jury believed that I didn't commit this alleged crime in 2015 but rather in 2017, they could find me not guilty on Count 1, since all of the governments evidence pointed to 2017 only. The jury was confused because Judge Marrero gave them two different time frames for Count 1 at the beginning of trial and before deliberations (page 14 of voir dire, trial transcript pages 89, 876–877).

Trial transcript page 633: While on the stand, I tried to bring up Kaira Brown's prior inconsistent statement saying we met in 2014, but Ms. Tarlow objected, and Judge Marrero sustained, so for the purpose of venue, I never got to explain to the jury that Kaira Brown came to me from Canarsie, Brooklyn, not from Manhattan. I was never asked any questions about venue in reference to Kaira Brown so the jury only had her testimony to go off of when she claimed she came to my apartment from Manhattan instead of Canarsie like she originally said.

38

Trial transcript page 641: Judge Marrero saying "people can have more than one place" was extremely prejudicial and confused the jury in reference to venue and where I lived at what point. Based on that statement, the jury could have believed I had two apartments in 2014/2015 and sex trafficked Kaira Brown from one of them even though my lease agreement proves I didn't move to 2458 Nostrand Avenue until April 1, 2016.

## Rule 33 Motion

Judge Marrero's denial of my Rule 33 motion filed on May 19, 2021 is another example of his biased behavior against me. In his discussion he overlooked very important factors that were legally relevant and would not have been ignored by any reasonable judge. He also manipulated certain facts to justify his ruling in the governments favor. The following arguments are about certain sections of the court's opinion denying my Rule 33 motion that I believe prove this.

- Page 6: "The court is ~~unpersuasive~~ <ins>unpersuaded</ins> that ~~kids~~ <ins>Kidd's</ins> delay in filing the instant motion resulted from 'excusable neglect.' Kidd's guilty verdict was returned on July 15, 2019. Time to file the instant motion expired on July 29, 2019 – yet it was filed nearly 2 years later on May 19, 2021. The length of this delay is significant."

With this statement, Judge Marrero overlooks the fact that, during trial, I was having issues with my CJA lawyer, Mr. Zachary Margulis-Ohnuma, and even

requested on the record to represent myself with him as standby counsel, which

Mr. Margulis refused (trial transcript pages 189–199). What Judge Marrero also

overlooks is the fact that once I fired Mr. Margulis, Mr. Florian Miedel was

appointed on July 27, 2019, which was two days before the deadline to file the

Rule 33 motion. Mr. Miedel had to set up a time to receive my entire case file from

Mr. Margulis and go through everything with a fine-toothed comb to prepare for

my Rule 29 hearing on venue. Nowhere in Judge Marrero's discussion does he

acknowledge any of the protective orders that were on the 3500 material and

evidence barring me from having them in my possession, which I also brought up

on the record (Tr. 189–199). The only reason the protective orders were finally

lifted is because Mr. Miedel was able to come to an agreement with the

government after numerous attempts, and it was only then that I noticed the blatant

discrepancies that were hidden at trial, since the government never publicly

published any of the photos showing Kaira Brown's thigh tattoo for myself or the

jury to see, which plays a part in the *Brady* violation. Judge Marrero ignores the

fact that Mr. Margulis admitted the discrepancy prior to trial and simply chose not

to bring it to my attention or the jury's, which is where the ineffective assistance of

counsel claim comes in.

40

- Page 7: "The court further acknowledges that the government 'has a significant interest in the finality of the verdict and getting the defendant sentenced.'"

This statement shows blatant bias. The main point of the Rule 33 motion was to show that an innocent man was wrongfully convicted at trial by a jury of his peers due to prosecutorial misconduct and blatant negligence by his attorney. Instead of acknowledging that and attempting to remedy the problem, Judge Marrero was more concerned with punishing me at sentencing.

- Page 8: "Moreover, while defense counsel argues that he did not 'see a need to examine' the trial exhibits, this claim is undermined by his argument on the Rule 29 motion itself, which made repeated reference to certain photo evidence."

Judge Marrero was aware that the photo evidence Mr. Miedel was referring to on the Rule 29 motion were the alleged child pornography photos that got me convicted on Counts 1 and 5, not the newly discovered photos included in the Rule 33 motion. These were two totally different sets of photos and had Mr. Miedel been aware of the discrepancy, he would have brought it to the court's attention immediately.

- Pages 10–11: "To the extent Kidd argues that the government violated *Brady* by delaying disclosure of the photos and Victim One's identity, the

41

argument is unavailing. Before trial, and despite the governments

representations that it was 'still waiting for the electronic content from

certain ~~sees~~ seized devices,' trial ~~counsel~~ counsel insisted on proceeding to trial

'immediately.' The short time between the disclosures and trial was

therefore not a delay tactic on the government's part, but rather a

strategic decision on the part of trial counsel to avoid the unearthing of

more incriminating evidence. ("I would rather move forward to trial with

a witness testimony and not risk that there is some corroboration.") ("The

client still wants to press onto trial despite us not having looked at that.")

("Given all of the circumstances, I made a reasoned and professional

judgment that it was a reasonable strategy to do that.")

   At this point before trial, I hadn't been superseded with Count 5 because the

government hadn't retrieved any of the alleged CP (child pornography) media from any of my

electronic devices yet. Up until this point I was facing four counts of sex

trafficking based on hearsay from extremely unreliable witnesses who weren't

credible, and "recruitment ads" from ~~before~~ 2017. Law enforcement came across

those devices during an illegal search. Their initial purpose for coming to my place

of residence on December 12, 2018, was to arrest me based on them having an

arrest warrant. They didn't have a search and seizure warrant and had I been

arrested anywhere other than my apartment, my electronic devices wouldn't have

been relevant since law-enforcement only got a search and seizure warrant after "observing" certain items of interest during an unnecessary "protective sweep." A few weeks later after the hearing in question, the government was able to supersede me with Count 5 based on the ruling of Judge Marrero at the evidence suppression hearing. Had he ruled in my favor, Count 5 wouldn't exist, and I would've been fully acquitted of Count 1, since Count 5 is what got me convicted of any counts. The discovery that Judge Marrero mentioned wasn't relating to my original indictment. It was acquired after by the government in hopes of finding evidence to help them build a case against me which was supposed to have been done prior to my arrest. Whenever the government indicts and arrests someone, it is reasonably assumed that they are prepared for an immediate trial, because they have all the evidence they need for a conviction, or at least the majority. Keeping this in mind, I exercised my right to a speedy trial under the 14th Amendment. It is extremely unethical to indict and arrest someone on a "barebones" case, deny them bail, and then try and build a case against them while they are imprisoned. Also the alleged child pornography media and the discrepancy photos weren't evidence at this time because they hadn't been discovered yet, hence Mr. Margulis's statement "I would rather move forward to trial with the witness testimony and not risk that there is some corroboration." Also had the government not had any electronic devices, they

43

wouldn't have had access to the photos used to re-create a lot of the "reconstructed" Backpage ads.

- Page 12: "Both Kidd and Victim-1 testified that Victim-1 was the girl depicted in the second set of photos."

Here Judge Marrero completely ignores the fact that at trial I was being asked to identify media that had been recorded two and a half years prior, that I was seeing for the first time at trial. Since it was alleged to be child pornography, I wasn't allowed to see it prior to then, not even through my attorneys on a legal visit. All I had to go on was a very vague description of what the media showed. Mr. Margulis told me the prosecutors were sure it was Kaira Brown, so I was more concerned about the alleged time stamp of it. Judge Marrero also completely ignores the facts that (1) on the stand I was clearly hesitant about giving any answer as to the identity because I wasn't sure, but eventually answered "yes" because I was scared of perjuring myself, and (2) that Kaira Brown was on record as not being AWOL from the facility when the alleged child pornography was produced, and it is impossible for Kaira Brown to have been in two places (Brooklyn and Manhattan) at once. My final point on Judge Marrero's biased ruling denying my Rule 33 motion is the fact that he acknowledged and entertained it knowing what it contained. If he felt that the motion was untimely because it was almost two years too late, then why not simply deny it after it was filed? Why go

through the process of allowing the government to respond and Mr. Miedel to

reply before giving a ruling he could have made after the initial motion was filed?

It appears that he allowed the government to respond in hopes that they would

have a strong argument, but once he realized they didn't, he denied the motion

immediately after allowing Mr. Miedel to reply. *In reference to that last point, if Judge Marrero had to control over the 10 page deadline, then I apologize to God and ask that He please forgive my ignorance because I was misinformed about how that process works.*

**Sentencing**

Judge Marrero sentencing me to 256 months' imprisonment was the ultimate

act of biased behavior. My guidelines range was 210–262 months. He said he did

not consider acquitted conduct. He also said he took the Covid pandemic into

account, but my 256-month sentence clearly contradicts these statements. The two

counts I was convicted of at trial were non-violent and stemmed from the same

alleged ~~harassment~~ *incident* with the same person who was allegedly 17 years and 11

months old. In no way am I minimizing the crimes of sex trafficking or inducement

of a minor, but I do believe that the details matter and that the punishment should

fit the crime. The fact that both charges ~~were~~ *carried* mandatory minimums meant that no

matter what, I was going to be sentenced to more time in prison than people

convicted of child molestation, which is a far more vicious and heinous crime. The

Covid pandemic and the extremely harsh conditions of confinement of inmates is

also widely known. By the time I was sentenced I had suffered through Covid for

two years, yet Judge Marrero only took off six months from the high end of my

guidelines in "consideration" of it. Judge Marrero also ignored the fact that while

incarcerated I was sexually harassed along with other inmates by officer J. Mobley,

which was on record, and I was set up to be assaulted and almost killed by officer

Tova Noel which is also in my medical records. He even went as far as ignoring

the award I was given for saving a nurse's life while at MDC Brooklyn. All of

these events were grounds for a downward departure and possible 5K2, but I didn't

receive either. In *United States v. Mateo*, 02-CR-668, the defendant suffered harsh

conditions of confinement as well, but Judge Marrero granted her a downward

departure and some of our issues were similar. Ms. Mateo was sexually harassed

by a guard as well and at some point we were both placed on suicide watch. Judge

Marrero not acknowledging me being harassed is a prime example of why male

sexual assault goes unreported because most people don't take it seriously. Maybe

he ignored it because I'm a black man and she was a Hispanic woman. She had a

drug offense and I was accused of a sex offense. She pled guilty and I went to trial.

I believe that Judge Marrero's sentence of 256 months was mainly because I

exercised my right to go to trial. "Under our Constitution, defendants can only be

convicted of a crime if a jury of their peers finds they are guilty beyond a

reasonable doubt. However, federal law inexplicably allows judges to override a

verdict of not guilty by sentencing defendants for acquitted conduct. This practice

is inconsistent with the constitutional guarantees of due process and the right to a

46

jury trial. Our bipartisan, bicameral bill would make it clear that this unjust

practice is prohibited under the federal law," said Democratic Senator Dick

Durbin, chairman of the Senate Judiciary Committee. "If any American was

acquitted of past charges by a jury of their peers, then some sentencing judge down

the line shouldn't be able to find them guilty anyway and add to their punishment.

A bedrock principle of our criminal justice system is that defendants are innocent

until proven guilty. The use of acquitted conduct in sentencing punishes people for

what they haven't been convicted of. That's not acceptable and it's not American.

Back in 2014, justices Scalia Thomas and Ginsberg all agreed, but weren't able to

hear the case and stop the practice. Our bill will finally prohibit under federal law

what many already find patently unconstitutional," said Republican Senator

Charles Grassley.

    For all the foregoing reasons, if the court remands my case to the district

court, I would like to request a new judge.

**Case Law**

*United States v. Tara Haynes/2nd Circuit/#12-626-CR*

    This Court found that (1) Tara Haynes's right to due process was violated by

requiring her to stand trial in shackles without a specific finding of necessity on the

record by the trial judge; (2) the trial court abused its discretion by not conducting

any inquiry about an allegation of juror misconduct; (3) the trial court erred in

giving an additional unsolicited, modified *Allen* charge that should have at least included balancing, cautionary language; and (4) the cumulative effect of the errors, including Haynes's improper shackling, the failure to investigate potential jury misconduct, the improper *Allen* charge, and at least two serious evidentiary errors, undermined the guarantee of fundamental fairness to which she was entitled. As a result, Haynes's conviction was vacated and her case was remanded.

*United States v. Patrick Murray*/2nd Circuit/#11-351-CR

This Court found that the district court's refusal to allow Patrick Murray to present surrebuttal evidence to respond to new evidence introduced by the government on rebuttal denied him his right to present a meaningful defense. As a result, Patrick Murray's judgment of conviction was vacated and his case was remanded.

*United States v. Scott D. Kapsten*/2nd Circuit/#13-417-CR

This Court found that (1) the jury note reflected confusion regarding whether the "before you may render a verdict" language in the original jury instructions authorized a finding of guilt even if the entrapment defense were successful or the argument failed to sustain its burden of proof on the element of the offense, and the supplemental instructions compounded the problem; (2) the district court's supplemental instructions regarding inducement and the "first step" were inconsistent and problematic given the facts of the case; (3) the jury instructions

compounded the jury's bewilderment regarding Scott's only viable defense; and (4) because the court's doubts are sufficient to call into question the fairness and integrity of Kapsten's conviction, his conviction for transporting and shipping child pornography must have been vacated. As a result the conviction was vacated and the case was remanded for a new trial.

*United States v. Dennis Joseph*/2nd Circuit/#06-5911

Most of the jury instruction on the "enticement" element properly reflected the required focus on attempting or intending to entice. The instructions stated that the government need show only "that the defendant attempted to convince or influence the person he believed was a 13-year-old girl to engage in a sexual act with him." However the alternative basis for conviction in that instruction — "or made the possibility of a sexual act with him more appealing" — did not reflect the requirement of an intent to entice by providing the "more appealing" formulation as an alternative to the "convince or influence" language, which had previously been explained as examples of "enticing." The challenged language permitted conviction even if Dennis Joseph did not intend to entice the victim into engaging in a sexual act with him. Because the jury charge permitted conviction on an invalid basis and because the risk that the jury grounded its verdict on that basis was not insubstantial, Dennis Joseph was entitled to a new trial.

49

**Attached Exhibits**

- Affidavit of Allison Grant

- Cash award for saving nurse's life at MDC Brooklyn

- Statement I made at sentencing

- Email between me and Victoria Medley

- Emails between me and Zachary Margulis-Ohnuma

Improper Venue

Kaira Brown said that we first got in contact in spring of 2015 and that she

took the 2 train to Flatbush Avenue in Brooklyn from her group home (Good

Shepherd Services) in Manhattan, which is located on 17th Street between 1st and

2nd Avenues. Trial Transcript pages 117–118. She then confirmed that I lived in

the Nostrand Avenue apartment during the time that she allegedly worked for me

as a prostitute. Trial Transcript page 123. Later on, Kaira Brown said again that she

took the 2 train to my apartment on Nostrand Avenue and confirmed that that was

the only place she ever knew me to live and the only place she alleged to have

engaged in prostitution for me. Trial Transcript pages 176-177.

Based on that testimony and the fact that I did not move into 2458 Nostrand

Avenue until April 1, 2016, it's impossible that Kaira Brown worked for me as a

prostitute in 2015. The apartment I lived in before 2458 Nostrand Avenue was

1423 Stanley Avenue, which is on the other side of Brooklyn in East New York,

one block away from Howard Beach, Queens, and is nowhere near the 2 train. The

closest train station to Good Shepherd Services is 14th Street-Union Square, which

includes the 4, 5, 6, L, Q, and R trains, but not the 2 train. Kaira Brown would have

had to use one of those trains to transfer to the 2 train to take to Flatbush Avenue.

That logically wouldn't make sense since the 5 train also goes to Flatbush Avenue

and runs express, unlike the 2 train, which runs local and takes a lot longer. The

51

closest trains to 1423 Stanley Avenue are the A and C trains. On the stand, Kaira Brown never mentioned having to transfer to get to the 2 train. She claimed that she was a frequent guest at my apartment and that she always came to me from Good Shepherd, so it's highly unlikely that she would have made a mistake like that unless she was lying. Her testimony proves that her timeline is off and that venue for this case is improper. She never took the 2 train to my apartment, which is why she was unfamiliar with how it worked. If someone claims that they use the same method of transportation to get to the same place for over two years, how likely is it that they would not know how to get there properly? The more likely scenario is that Kaira Brown was already working as a prostitute in Brooklyn when we first got in contact, which is consistent with what she initially said in her in person interview with the FBI when she said she came to me from Gary's apartment in Canarsie, Brooklyn, which was on 100th Street between Ave. J and Ave. K, which is located near the L train.

**Case Law**

*United States v. Lavellous Purcell/2nd Circuit/#19-238-CR*

This Court found that the government failed to present sufficient evidence of venue with respect to a charge of enticement to engage in unlawful sexual activity in violation of 18 U.S.C. § 2422(a). The Court held that a reasonable jury could not have found that Lavellous Purcell committed within the jurisdiction any conduct

essential to the offense or that any of the victims engaged and sex work or

interstate travel for purposes of prostitution in that district as a result of his

enticements. As a result, Purcell's conviction on Count 1 was reversed.



Map of public transportation route from Good Shepherd Services to 2458 Nostrand Avenue.



Map of public transportation route from Good Shepherd Services to 1423 Stanley Avenue.



Map of public transportation route from Good Shepherd Services to E 100th Street and Avenue J (approximate location of Gary's apartment in Canarsie).



Map of public transportation route from E 100th Street and Avenue J (approximate location of Gary's apartment in Canarsie) to 2458 Nostrand Avenue.

## Ineffective Assistance of Counsel

On July 1, 2019, the government disclosed 3500 material for its witnesses, including Kaira Brown. Included in the 3500 material for Kaira Brown were text messages between Kaira Brown and Detective Rosemary Muckenthaler, handwritten notes from an in-person interview with Kaira Brown on June 6, 2019, and a typed official FBI report from June 11, 2019 based on the interview with Kaira Brown on June 6, 2019. Based on the FBI interview with Kaira Brown, Mr. Margulis was well aware that there were serious issues with regard to venue since Kaira Brown stated that when we first got in contact she had been working as a prostitute for a man named Gary in Canarsie, Brooklyn. Prior to that, venue was raised in a pretrial motion since I resided in Brooklyn and that's where all my alleged crimes took place, but I was being prosecuted in SDNY. Mr. Margulis was also aware that improper venue was an element that could have gotten me acquitted of each count if it was proven to the jury. He had this knowledge but didn't ask Kaira Brown one question with reference to her prior statement about us first coming in contact while she was in Brooklyn. He also did not try to impeach her on this issue either. When I took the stand on direct, Mr. Margulis didn't ask me any questions regarding venue. After Kaira Brown's testimony I went on record that I wanted to represent myself with Mr. Margulis as standby counsel. Tr. 189–199. I also made it clear that counsel wasn't asking the right questions and that

this played a big part in me wanting to represent myself. Tr. 193. During a sidebar in the middle of Kaira Brown's testimony, Mr. Margulis confirmed that he was aware of Kaira Brown's statement and 3500 material because he brought it up on page 164. Later on, during Kaira Brown's cross, he brought up the dates June 11, 2019 and June 6, 2019 which respectively are the dates of the typed report and handwritten notes from the in-person interview with Kaira Brown, when Mr. Margulis tried to impeach her about what age she said she was when she met me.

It's possible that Mr. Margulis didn't bring up venue because he wasn't sure he was allowed to, since he was banned by the judge from mentioning "other pimps" that Kaira Brown worked for. But he should have at least attempted to impeach Kaira Brown on venue, that way if it got objected to by the government, he could have asked the judge for a ruling, and it would have been on record for appellate purposes. He did question Dana McLeod about venue. Trial Tr. 451, 496, 500.

**Case Law**

_United States v. Ralph Nolan_/2nd Circuit/#16-3423

This Court found that the district court erred in denying Ralph Nolan's motion pursuant to 28 U.S.C. § 2255 to vacate his conviction on the ground of ineffective assistance of counsel, because he received ineffective assistance when his lawyers did almost nothing to challenge the eyewitness identification testimony

58

that formed the core of the government's case, even though the identification bore glaring indicia of unreliability, and because he received ineffective assistance when his counsel did not seek to exclude or object to the admission of a highly prejudicial and dubiously relevant photo of Ralph posing with what appeared to be a handgun, and both instances of ineffective assistance prejudiced him. As a result, Nolan's judgment was reversed and his case was remanded.

**Attached Exhibit**

- Affidavit of Satasha Senior

<u>Conclusion</u>

For the reasons stated above, I respectfully ask in the interests of justice that this Court (1) vacates my conviction; (2) grants me a new trial; and (3) grants such further relief as this Court deems just and proper. *with prejudice*

Respectfully,

*Lloyd Kidd*

Lloyd Kidd

The main reason the government didn't publicly publish Exhibits 1213 or 1217 is because if they did I would've instantly remembered that Kiara Brown had a thigh tattoo and nipple rings when we first met and would've been able to testify truthfully that the alleged child pornography media wasn't her. The reason I forgot those details is because I didn't know Kiara long, but logically speaking, why wouldn't I have pointed out such important details to the jury if it could've gotten me fully acquitted and saved my life? Once my attorney Mr. Florian Miedel was legally allowed to show me the trial exhibits, I recalled these details immediately, hence the Rule 33 motion he filed right after.